KHOUZAM, Judge.
Maria D. Gutierrez appeals the final summary judgment entered in favor of Dairyland Insurance Company. The ultimate issue in this case concerns whether Dairyland acted in bad faith in failing to settle a claim against its insured, Ms. Gutierrez. Because there are genuine issues of material fact for determination by the fact-finder concerning whether Dairyland’s actions were reasonably diligent and exercised with reasonable care, we reverse.
FACTS AND PROCEDURAL HISTORY
On August 12, 2003, Maria D. Gutierrez, who was insured by Dairyland, was driving her van when she made a left turn directly into the path of a motorcycle operated by Mr. Yochim. The impact caused Mr. Yo-chim to be ejected from his motorcycle. He landed about nineteen feet away. The police and paramedics arrived, and Mr. Yochim was taken to the hospital. Mr. Yochim sustained serious injuries and stayed in the hospital for thirteen days. After his stay in the hospital, Mr. Yochim was transferred to a nursing home.
Ms. Gutierrez immediately reported the accident to Dairyland. The day after Ms. Gutierrez reported the accident, Dairyland assigned James McDonald to handle the claim. Mr. McDonald spoke generally about the accident with Ms. Gutierrez. He ascertained that neither the insured nor her daughter, who was in the van with Ms. Gutierrez at the time of the accident, was injured. He advised her that she had $10,000 coverage limits — $10,000 in property damage coverage and $10,000 in bodily injury coverage. He concluded that the insured was probably at fault in causing the accident.
Mr. McDonald attempted to call Mr. Yochim, who was still in the hospital, but he was unable to reach him. Mr. McDonald then ordered an appraisal of Mr. Yochim’s motorcycle and assigned that portion of the damage claim to Dairyland’s claim service center in Virginia.
On August 18, 2003, Mr. McDonald received a call from Mr. Frank Verdi, an attorney, who indicated that he was representing Mr. Yochim. Ten days later, however, Mr. Verdi notified Mr. McDonald that he was no longer representing Mr. Yochim and provided him with a notice of his attorney’s lien.
On August 20, Mr. McDonald obtained the accident report. The report stated that Ms. Gutierrez turned directly in front of Mr. Yochim and that he was ejected nineteen feet and suffered an “incapacitating” injury.
On August 26, the appraisal of the motorcycle revealed that it was a total loss. Mr. McDonald authorized payment of the full $10,000 property damage policy limits. On August 29, Mr. McDonald sent Ms. Gutierrez a certified letter advising her that because the property damage would exceed her insurance coverage, she was personally exposed to an excess judgment for both property damage and bodily injuries. In the letter, Mr. McDonald acknowledged “[i]t has also been reported to us that the claimant sustained serious bodily injuries in this matter,” and he cau *1223 tioned that Dairyland “will make every effort to resolve these claims within your insurance coverage. Due to the serious nature of the accident, this may not be possible.... Under no circumstances will Sentry Claims Service or Dairyland Insurance Company assume responsibility for any claims or judgments in excess of your insurance coverage.”
On September 9, Mr. Yochim’s new attorney, Mr. 0. John Alpizar, sent a letter to Mr. McDonald asking for policy information within thirty days. Dairyland did not provide that information until sixty days later. On October 9, Mr. McDonald spoke with Mr. Alpizar’s paralegal and was informed that Mr. Yochim sustained a significant spinal cord injury and might be paralyzed. After this conversation, Mr. McDonald set the reserves for the bodily injury claim to the full $10,000 policy limit and sent a letter to Mr. Alpizar’s law firm asking for Mr. Yochim’s medical records and bills as “[w]e would like to settle your client’s bodily injury claim as soon as possible.” He also informed them of Mr. Verdi’s attorney’s lien and indicated that Mr. Verdi’s name needed to be on the settlement check. On December 19, Mr. Alpizar sent medical authorization forms signed by Mr. Yochim to Mr. McDonald. Mr. McDonald did not order the records until January 13, 2004, almost five months after the accident, and notably, he requested only the hospital records. Mr. McDonald received the hospital records on January 30 and, on February 4, he sent a letter to Mr. Alpizar acknowledging the serious injuries Mr. Yochim suffered and offering to settle the claim contingent upon placing Mr. Verdi’s name on the settlement check or obtaining an agreement regarding the lien.[1] His letter indicated that he would be contacting Mr. Verdi to ascertain whether Mr. Verdi intended to pursue his lien. The record does not reflect that Mr. McDonald ever contacted Mr. Verdi.
On February 5, Mr. McDonald sent a status report to Ms. Gutierrez informing her that Mr. Yochim had an extended hospital and nursing home stay due to his serious injuries, which included a spinal cord injury, vertebrae fractures, rib fractures, a punctured lung, and a scalp laceration. Mr. McDonald advised her that he had offered to pay the bodily injury liability limit of $10,000 but cautioned that because of the serious injuries it might be impossible to settle within the policy limits. On February 11, Mr. McDonald sent another letter to Mr. Alpizar identical to the letter of February 4. Mr. Alpizar responded on February 17 and advised “if and when the policy limits are tendered, I will discuss it with my client and advise you of his decision.” Mr. Alpizar indicated that he would be responsible for any alleged lien on the part of the prior attorney.
On March 2, in response to Mr. Alpizar’s February 17 letter, Mr. McDonald expressed uncertainty as to the word “tender.” He thought he had already “tendered” the policy limits, even though no check had been enclosed. Again, he wanted assurance that Mr. Alpizar would be responsible for the payment of any potential attorney’s lien. On March 8, Mr. Alpi-zar explained that there had not been a tender of policy limits and that if Mr. McDonald was unsure of that term, he needed to check with his legal department. Mr. Alpizar added that due to the “catastrophic nature of my client’s injuries” there should have been a tendering of policy limits. Once again Mr. Alpizar advised Mr. McDonald that Mr. Yochim *1224 would be responsible for any potential attorney’s lien.
On March 24, 2004, Mr. McDonald faxed a copy of Mr. Verdi’s August 28, 2003, attorney’s lien to Mr. Alpizar. On the cover sheet, he again expressed confusion over the term “tender of policy limits.” He also sent a letter on March 25 indicating: “We feel that our offer to settle your client’s claim ... is tender of the limits.” He informed Mr. Alpizar that if he wanted the settlement check, he would need to put in writing that he would settle the attorney’s hen from the proceeds of the check. Mr. Alpizar responded by insisting that his demand for a tender of policy limits was clear and if Mr. McDonald needed clarification, he needed to check with his legal department. He also questioned the potential insignificance of the attorney’s lien saying “I cannot imagine how much of a lien Mr. Verdi may have when this accident occurred on August 12, 2003 and his letter to you advising you of a lien is dated August 28, 2003.”[2]
On April 1, 2004 — almost eight months after the accident — Dairyland formally tendered the policy limits of $10,000. Mr. Alpizar expressed surprise at how long it had taken Dairyland to tender the limits especially due to the catastrophic nature of the injuries. He advised Mr. McDonald that Dairyland’s delay caused his client to direct him to file suit against the insured, Ms. Gutierrez. In deposition he testified that his client would have settled the claim at any point through February.
Mr. Yochim and his wife, Patricia Yo-chim, did, in fact, file suit against Ms. Gutierrez, and she filed a bad faith claim against Dairyland. A stipulated judgment in excess of the policy limits was entered by agreement among Mr. Yochim, Mrs. Yochim, Ms. Gutierrez, and Dairyland. The stipulated judgment expressly left open the issue of whether Dairyland had acted in bad faith in failing to settle Mr. Yochim’s claim.
In the bad faith action, Dairyland filed a motion for summary judgment arguing that as a matter of law it did not act in bad faith. It asserted that it had orally offered to settle for its policy limits within a day of receiving the medical records and that final judgment should be entered in its favor. In opposition to the motion, Ms. Gutierrez filed two affidavits, one by a claims handling expert and the other from an attorney. The substance of the affidavits was that based on the low limits of the insured’s policy and the potentially catastrophic injuries to Mr. Yochim, Dairyland should have tendered its policy limits no later than October 2003. The affidavits indicated that Dairyland’s method of claims handling was not appropriate under the circumstances; that Dairyland failed to conduct a thorough and prompt investigation using all sources available to all parties; that Dairyland demonstrated a lack of urgency and lack of concern to its insured; that Dairyland violated its fiduciary duty to its insured by failing to understand the duty to make a tender of policy limits as soon as the adjuster determined it was likely the value of the claim would exceed policy limits; that Dairyland breached its duty by refusing to protect the insured until it received medical records documenting the nature and extent of the injuries and requiring written confirmation of those injuries when it already knew of the severity of the injuries; and that the purported attorney’s lien should not have been *1225 a factor in the settlement considerations. The trial court granted summary judgment in favor of Dairyland.
THE STANDARD OF REVIEW
A trial court’s ruling on a motion for summary judgment is a question of law and is subject to the de novo standard of review. Volusia County v. Aberdeen at Ormond Beach, L.P., 760 So.2d 126, 180 (Fla.2000). Summary judgment should be granted only when there is a complete absence of genuine issues of material fact. Id. “[W]here material issues of fact which would support a jury finding of bad faith remain in dispute, summary judgment is improper.” Berges v. Infinity Ins. Co., 896 So.2d 665, 680 (Fla.2004).
DISCUSSION
It is well settled that an insurance company has an obligation to properly defend its insured from claims that are covered within the policy of insurance and that it must exercise good faith in satisfying that obligation. See generally Berges, 896 So.2d 665. When defending its insured against a claim, the insurer has a duty to “ ‘use the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business.’ ” Id. at 668 (quoting Boston Old Colony Ins. Co. v. Gutierrez, 386 So.2d 783, 785 (Fla.1980)). “The insurer must investigate the facts, give fair consideration to a settlement offer that is not unreasonable, and settle the claim, if possible, ‘where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so.’ ” Menchise v. Liberty Mut. Ins. Co., 932 So.2d 1130, 1132-33 (Fla. 2d DCA 2006) (quoting Gutierrez, 386 So.2d at 785)).
In Florida, the question of whether an insurer has acted in bad faith in handling claims against the insured is determined under the “totality of the circumstances” standard. Each case is determined on its own facts and ordinarily “[t]he question of failure to act in good faith with due regard for the interests of the insured is for the jury.”
Berges, 896 So.2d at 680 (internal citations omitted).
Here, Dairyland knew within days of the accident that its insured was entirely at fault in causing the accident. In addition, because the accident involved a motorcycle, Dairyland was aware that the insured would be responsible for all of the personal injury damages that exceeded her $10,000 policy, without regard to the issue of whether Mr. Yochim suffered a permanent injury. See § 627.732(3), Fla. Stat. (2006). Dairyland also knew that Mr. Yochim suffered catastrophic injuries. He was hospitalized for thirteen days and later transferred to a nursing home. He sustained a spinal cord injury, vertebrae fractures, rib fractures, a punctured lung, and a scalp laceration. We cannot say, as a matter of law, that Dairyland satisfied its duty of good faith under the circumstances presented in the record before us.
Dairyland argues that any delay in tendering the policy limits was caused by Mr. Alpizar, who failed to provide medical records and who, instead, sent out medical authorization forms. Dairyland asserts that it was trying to verify the full extent of the claimant’s injuries and had every right to wait for that medical information. Dairyland’s argument is unavailing because its fiduciary duty to timely and properly investigate the claim against the insured was not relieved simply because it was waiting to receive information from the claimant’s attorney. See Berges, 896 So.2d at 677 (“the focus in a bad faith case is not on the actions of the claimant but rather on those of the insurer in fulfilling its obligations to the insured”). Based on *1226 the record before us, it appears that Dairyland knew that Mr. Yochim’s injuries would exceed the policy limits of $10,000, and its failure to tender the policy limits created a genuine issue of material fact regarding whether it breached its duty of good faith.
Finally, Dairyland argues that summary judgment was appropriate because there was never a formal offer to settle the case. Under the facts presented, a lack of a formal offer to settle is a factor to be considered in determining whether the insurance company acted in bad faith. See Powell v. Prudential Prop. & Cas. Ins. Co., 584 So.2d 12, 14 (Fla. 3d DCA 1991).
Under these circumstances, whether it was reasonable for Dairyland to insist on additional medical information beyond what it already knew, whether it was reasonable for Dairyland to insist on further verification of the attorney’s lien issue, and whether Dairyland reasonably handled the purported “tender” are factual disputes that are for determination by the finder of fact.
CONCLUSION
Because the record contains genuine issues of material fact to be resolved by the fact-finder as to whether Dairyland acted fairly and with due regard for the insured’s interests, we reverse the final summary judgment.[3]
Reversed.
LaROSE, J., Concurs.
WHATLEY, J., Dissents with opinion.

. Interestingly, Mr. McDonald’s diary entry of January 29 reflected, "BI authorization request finalized on Yochim, Gerald. Settlement range $226,800 to $352,000; request $10,000.”

. On March 26, Mr. McDonald sought advice from an attorney and was told to immediately send the settlement check. He processed the check, but on April 1 he realized he had the wrong name on the check. On April 1, he drove to Mr. Alpizar's office and tendered a handwritten check with the correct name.

. We also reverse tire cost judgment that was entered in conjunction with the final summary judgment.