[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-12486

_____

DANIEL ILIAS,

Plaintiff-Appellant,

*versus*

USAA GENERAL INDEMNITY COMPANY,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:20-cv-00834-WFJ-TGW

_____

Before WILLIAM PRYOR, Chief Judge, and ROSENBAUM and MARCUS, Circuit Judges.

MARCUS, Circuit Judge:

On July 29, 2017, Scott Dunbar lost control of his van while driving on a divided highway in Pasco County, Florida. The van jumped the center median and landed directly on top of an oncoming car driven by Daniel Ilias. Ilias was seriously injured in the resulting wreck. He tore his aorta, broke several bones, and had to spend ten days in the hospital in a medically induced coma.

Dunbar's insurer, USAA General Indemnity Company, immediately began investigating. But despite learning that Ilias had suffered grievous injuries, so that his damages would almost surely exceed Dunbar's $10,000 policy limit, and despite determining that Dunbar was solely at fault for the accident, USAA delayed initiating settlement negotiations for over a month. Then, USAA failed to confirm for Ilias' attorney, Maryanne Furman, that Dunbar lacked additional insurance coverage with which to satisfy a judgment. Because Furman needed this information to agree to USAA's settlement offer (and release Dunbar from liability), the case did not settle, and Ilias obtained an approximately $5 million judgment against Dunbar in state court.

Ilias then commenced this action to hold USAA responsible for the judgment, bringing a single claim for bad faith under Florida common law. USAA moved for summary judgment, arguing that no reasonable jury could find that its conduct amounted to bad

faith or that its conduct caused the entry of the excess judgment against Dunbar.  The district court agreed, and entered final summary judgment for USAA.

Ilias now appeals the district court's order.  After thorough review of the record, and with the benefit of oral argument, we conclude that the district court erred and therefore reverse and remand this case for trial.

## I.

### A.

The accident that spurred this case involved three drivers: the insured, Dunbar; the Plaintiff, Ilias; and non-party Zenaida Brignoni.  On July 29, 2017, while driving southbound on County Road 1 in Pasco County, Florida, Dunbar lost control of his van and struck Brignoni's SUV, also traveling southbound.  The collision caused Dunbar's van to veer toward the center median, launch into oncoming traffic, and land directly on top of Ilias' Honda Pilot.

Ilias suffered catastrophic injuries, including a torn aorta and several broken bones.  He had to be airlifted from the crash site to the hospital, where he would remain in a medically induced coma in the intensive care unit for ten days before spending another three weeks in the hospital and a rehabilitation facility.  Dunbar was also transported to the hospital.  He hit his head requiring stitches, and broke his nose in the crash, but he was able to leave later that day. Brignoni sustained some back and neck pain but was able to go home immediately following the accident.

USAA first learned of the accident the day it occurred. Within two days, it had assigned a liability adjuster to investigate. The adjuster tried to contact Dunbar and the other drivers involved in the accident, requested a copy of the police report, and sent Dunbar an "excess letter" explaining that his potential liability for the damages from the accident could exceed his policy's limits -- up to $10,000 per person for bodily injuries and up to $20,000 per accident. The letter stated: "It's also important to let us know immediately if you have an umbrella or other liability policy that may provide coverage for your claim."

Dunbar gave USAA a statement on August 3. Though he didn't remember much, USAA was able to confirm that he had been injured and escalated the claim to an injury adjuster. The next day, USAA learned from a personal injury firm hired by Ilias' wife that Ilias had been hit head-on and was still hospitalized.

On August 8, Ilias' attorney spoke with USAA again. The attorney informed USAA that Ilias had suffered a torn aorta, a fracture to the right knee, and several leg fractures, and that he had just gotten out of the ICU (ten days after the accident). USAA then spoke with Brignoni's daughter and Dunbar. Brignoni's daughter told USAA that Brignoni "went home and has some back and neck pain." She also said that the driver of the "Silver SUV" -- Ilias -- had a broken leg, and that the officer at the scene believed the accident to be Dunbar's fault. As for Dunbar, USAA informed him that if he were found liable, there "could be a possible excess" because there were injuries alleged, and Dunbar's bodily injury and

accident coverage limits were only $10,000 and $20,000, respectively. At this point, based on the information it had gathered regarding the extent of Ilias' injuries and extended hospital stay, USAA elevated Ilias' claim to a more experienced adjustor, John Raymond.

On August 10, Ilias terminated the attorneys hired by his wife and retained a new lawyer, Furman. Furman visited Ilias in the hospital and concluded that his damages were "pretty significant" and likely exceeded Dunbar's $10,000 policy limit. The next day, Furman faxed a letter to USAA to notify it that she now represented Ilias. She also requested, "[p]ursuant to *Florida Statute § 627.4137*," a sworn statement from USAA providing information regarding Dunbar's USAA insurance policy, as well as the "name and coverage of any other known insurer." (emphasis in original). Raymond responded with a sworn statement of USAA's coverage a few days later, but he did not provide the name or coverage information of any other insurer or indicate whether USAA was aware of any other coverage. Raymond also called Furman on August 11 to discuss the case but did not reach her.

On August 14, Raymond received and reviewed a copy of the police report for the accident. The report concluded that Dunbar was solely at fault because he had been driving in a "[c]areless or [n]egligent [m]anner" and had been traveling 70 miles per hour in a 45-mile-per-hour zone. The report also noted that Dunbar and Ilias were both transported by EMS to Bayonet Point Regional Medical Hospital, and described Ilias' "[i]njury [s]everity" as

"[i]ncapacitating."  Upon reviewing the report, Raymond determined that USAA would be accepting liability for Ilias' claim -- but he did not convey this to Furman.  Nor did Raymond consider tendering the $10,000 policy limit to Ilias at this point.

Raymond and Furman next spoke on August 22, but they only discussed Ilias' property damage claim based on the damage to his vehicle.  This would be the last time Raymond and Furman spoke, since Raymond retired on August 30.  Raymond called Furman that day but was unable to reach her.  Furman returned Raymond's call the next day, but, unsurprisingly, did not reach him. Furman missed an additional call from a different USAA adjuster the next week, though she was not informed that Raymond had retired.  Furman attempted to contact Raymond a few more times but was told that USAA no longer had a valid voicemail box for him.

A new adjuster, Don Johnson, took over USAA's investigation on September 6.  Johnson called Furman to advise her that he would be handling the case and to set a date for the vehicle inspection.  As part of his initial review of the case, Johnson apparently misread the claim file and concluded that Ilias had only suffered a "cervical strain."  Nothing further happened until September 14, when Johnson missed a call from Furman, returned her call, and left a message with Furman's office asking to learn more about Ilias' treatment status.  The two spoke the next day, September 15, and Furman told Johnson that Ilias had "broke[n] at least a few bones," including his right leg, though she did not have any

medical records or bills to provide at that time.  Realizing that Ilias had suffered more than just a "cervical strain," Johnson immediately informed Furman that USAA would tender the $10,000 bodily-injury policy limit.

Following the call, Johnson sent Furman two letters.  The first said that a "coverage disclosure as outlined by the statute will be mailed to your office under separate letter," and enclosed a copy of the declarations page from Dunbar's policy.  The second letter enclosed a check for $10,000 and a general release from liability for Ilias to sign.  The parties dispute whether Johnson ever sent the coverage disclosure referenced in his first letter.  Johnson testified that he completed and mailed a standardized USAA disclosure form, which would have disclosed whether USAA was aware of any other policies or available coverage defenses.  But there is no record evidence showing the disclosure was mailed by USAA or received by Furman.  And Furman denied ever having received a completed disclosure form from USAA.

Furman did not respond to USAA's tender or otherwise speak with Johnson until October 12.  In the meantime, on October 9, Furman filed a personal-injury lawsuit on Ilias' behalf against Dunbar in Pasco County Circuit Court.  Dunbar notified USAA on October 12, at which point Johnson called Furman. When Johnson asked if the suit meant that Furman was rejecting USAA's settlement offer, Furman explained that she "could not accept [the policy] limits at this time" because she needed to depose Dunbar and

Brignoni to rule out the possibility that either had additional insurance or coverage.

After speaking with Furman, Johnson called Dunbar and told him that Furman had filed suit to take his deposition and rule out any additional insurance coverage. The record does not reflect that Johnson asked Dunbar whether he had any additional coverage, though, or discussed the possibility of providing Furman with a coverage affidavit. Despite Johnson apparently telling Dunbar why Furman had filed suit, USAA's Senior Litigation Manager sent Dunbar a letter on October 26 that said "[w]e will see what the plaintiff's attorney's plan is and reason for filing the lawsuit and not yet accepting your policy limit of $10,000." Then, in a separate letter, the Senior Litigation Manager told Dunbar that Ilias' suit sought "unspecified damages that may, but are not expected to, exceed the Bodily Injury limit of your policy."

Furman eventually deposed Dunbar and was able to confirm that Dunbar did not have any additional coverage to help satisfy an excess judgment. The case did not settle at that point, however. Instead, the case proceeded to a trial on damages (Dunbar conceded liability), and Ilias obtained a judgment against Dunbar in the amount of $5,230,559.44.

## B.

Ilias commenced this action against USAA in Pasco County Circuit Court, alleging a single claim for bad faith against USAA under Florida common law. USAA timely removed the action to

the United States District Court for the Middle District of Florida on the basis of diversity. After the parties had conducted discovery, USAA moved for summary judgment, which the district court granted. The district court concluded that there was no genuine dispute as to bad faith because USAA had, at most, acted negligently in handling Ilias' claim. While this alone, in the district court's view, would have been enough to grant summary judgment, the district court further concluded that no reasonable jury could find that USAA's conduct caused Ilias to obtain the excess judgment against Dunbar, because the evidence showed that Furman never intended to settle the case. The district court entered final judgment in favor of USAA the next day.

Ilias' timely appeal followed.

## II.

"'We review the district court's grant of summary judgment de novo, viewing all facts and drawing all inferences in the light most favorable to' the nonmoving party." *Pelaez v. Gov't Emps. Ins. Co.*, 13 F.4th 1243, 1249 (11th Cir. 2021) (citation omitted). Under this familiar standard, "[s]ummary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Craig v. Floyd County*, 643 F.3d 1306, 1309 (11th Cir. 2011) (quoting Fed. R. Civ. P. 56(a)).

In diversity cases, we are *Erie*-bound to apply the substantive law of the forum state; here, Florida. *Mesa v. Clarendon Nat'l*

*Ins. Co.*, 799 F.3d 1353, 1358 (11th Cir. 2015). Florida's bad-faith law "imposes a fiduciary obligation on an insurer to protect its insured from a judgment that exceeds the limits of the insured's policy," otherwise known as an "excess judgment." *Harvey v. GEICO Gen. Ins. Co.*, 259 So. 3d 1, 3 (Fla. 2018). Although this "duty [of good faith] is one that the insurer owes to the *insured*," Florida law authorizes the victim -- here, Ilias -- to "sue the insurer directly for its bad-faith failure to settle on the insured's behalf." *Eres v. Progressive Am. Ins. Co.*, 998 F.3d 1273, 1278 (11th Cir. 2021) (emphasis in original). Any damages claimed by the insured (or the victim standing in his shoes) "must be caused by the insurer's bad faith." *Am. Builders Ins. Co. v. Southern-Owners Ins. Co.*, 56 F.4th 938, 945 (11th Cir. 2023) (quoting *Harvey*, 259 So. 3d at 7).

In other words, a bad faith claim under Florida law has two elements: (1) bad faith conduct by the insurer, which (2) causes an excess judgment to be entered against the insured. *See Perera v. U.S. Fid. & Guar. Co.*, 35 So. 3d 893, 899 (Fla. 2010). Ilias contends that the district court erred because a reasonable jury could find in his favor on both issues. We agree.

## A.

The issue of bad faith conduct first. Bad faith "is determined under the 'totality of the circumstances' standard, and we focus 'not on the actions of the claimant but rather on those of the insurer in fulfilling its obligations to the insured.'" *Am. Builders*, 56 F.4th at 945 (first quoting *Harvey*, 259 So. 3d at 7; and then quoting *Berges v. Infinity Ins. Co.*, 896 So. 2d 665, 677 (Fla. 2004)). "That

said, a claimant's actions -- such as a decision not to offer a settlement -- remain relevant in assessing bad faith." *Id.* "Insurers have obligations to advise the insured of settlement opportunities, to advise as to the probable outcome of the litigation, to warn of the possibility of an excess judgment, and to advise the insured of any steps he might take to avoid the same, as well as to investigate the facts, give fair consideration to a settlement offer that is not unreasonable under the facts, and settle, if possible, where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so." *Id.* (cleaned up) (quoting *Bos. Old Colony Ins. Co. v. Gutierrez*, 386 So. 2d 783, 785 (Fla. 1980)).

On the surface, USAA appears to have complied with some of these obligations. USAA "warn[ed] [Dunbar] of the possibility of an excess judgment," *id.*, just a few days after the accident, and then again in a phone conversation on August 8 and a letter on October 26. USAA began to "investigate the facts" of the case, *id.*, by collecting Dunbar's statement, corresponding with Ilias' attorneys over the course of several weeks, and obtaining a copy of the police report. And USAA ultimately tendered the policy limits, offering to settle with Ilias in exchange for a release of liability. Furman never offered to settle or sent a counteroffer, so USAA complied with its obligation to "give fair consideration to a settlement offer that is not unreasonable under the facts." *Id.*

We are mindful, however, of the Florida Supreme Court's recent reminder that these obligations "are not a mere checklist." *Harvey*, 259 So. 3d at 7. "An insurer is not absolved of liability

simply because it advises its insured of settlement opportunities, the probable outcome of the litigation, and the possibility of an excess judgment." *Id.* "Rather," Florida's highest court has emphasized, "the critical inquiry in a bad faith [action] is whether the insurer diligently, and with the same haste and precision as if it were in the insured's shoes, worked on the insured's behalf to avoid an excess judgment." *Id.* That inquiry "is determined under the 'totality of the circumstances.'" *Id.* (citation omitted). When viewed through this lens, we are satisfied that there is a genuine issue of material fact as to whether USAA's handling of Ilias' claim amounted to bad faith.

## 1.

First, USAA unduly delayed in initiating settlement negotiations with Ilias. In cases "[w]here liability is clear, and injuries so serious that a judgment in excess of the policy limits is likely, an insurer has an affirmative duty to initiate settlement negotiations." *Powell v. Prudential Prop. & Cas. Ins. Co.*, 584 So. 2d 12, 14 (Fla. 3d DCA 1991). "In such a case, where the financial exposure to the insured is a ticking financial time bomb and suit can be filed at any time, any delay in making an offer . . . even where there [i]s no assurance that the claim could be settled could be viewed by a fact finder as evidence of bad faith." *Harvey*, 259 So. 3d at 7 (cleaned up).

In *Powell*, Florida's Third District Court of Appeal reversed the grant of a directed verdict in favor of an insurer where the record showed that the insurer was aware of the seriousness of the

victim's injuries (the insurer had received multiple letters from the victim's attorney), and that the insurer had assessed its own insured to be at fault within days of the accident. 584 So. 2d at 13. Though liability was clear, and the insurer was aware that the victim's claim would likely exceed the policy limit, the insurer delayed an additional month before making an offer. *Id.* The court therefore held that material issues of fact as to the insurer's bad faith remained for the jury to decide. *Id.* at 14-15.

Similarly here, the record demonstrates that USAA was aware of the grievous nature of Ilias' injuries and that it had assessed Dunbar to be solely liable for the accident. USAA learned as early as August 8 that Ilias had suffered a torn aorta, a fracture to his right knee, and several leg fractures, and that these injuries had kept him in the ICU for ten days following the accident. Indeed, USAA escalated the case to a more experienced adjuster, Raymond, because of the severity of Ilias' injuries and the duration of his hospital stay. Raymond then determined that USAA would accept liability for the accident on August 14, after he received and reviewed the police report. At this point, USAA arguably should have treated Ilias' claim as a "ticking financial time bomb" and promptly tendered Ilias the policy limit. *Harvey*, 259 So. 3d at 7 (quotation mark and citation omitted); *compare Powell*, 584 So. 2d at 13-15*, with Eres*, 998 F.3d at 1275 (affirming grant of summary judgment where insurer tendered full $10,000 bodily-injury policy limit the day it learned of the accident). Instead, USAA delayed for over a month, failing to do so until September 15.

USAA argues that this case is distinguishable from *Powell* because, there, the insurer ignored the claimant's attorney for weeks, whereas here it was Furman who often failed to respond, with USAA "continuously attempt[ing] to contact" her to settle the case. Br. for Appellee at 23-24. In essence, USAA tries to pin its delay in tendering the policy limits on Furman. But to rule in favor of USAA simply because Furman failed to respond to some but by no means all of its calls would be to ignore the well-established principle that "in Florida bad faith suits, the focus must remain on the actions of the insurer." *Brink v. Direct Gen. Ins. Co.*, 38 F.4th 917, 923 (11th Cir. 2022); *accord Harvey*, 259 So. 3d at 7. Regardless of whether Furman was slow to respond -- and the record is fairly in dispute about this -- our focus properly remains on the conduct of USAA. *See Harvey*, 259 So. 3d at 7. And here, the undisputed evidence shows that USAA had the information it needed to tender the policy limits on August 14, yet did not even initiate settlement negotiations for another month.

USAA next argues that its delay in tendering the policy limit was justified because Ilias' claim was not the only one arising out of the accident. According to USAA, had it immediately settled with Ilias, it would have left Dunbar exposed to a suit by Brignoni and her passengers, who had also sustained injuries in the crash. *See Shuster v. S. Broward Hosp. Dist. Physicians' Pro. Liab. Ins. Tr.*, 591 So. 2d 174, 177 (Fla. 1992) (noting that when multiple claimants exist, an insurer has a duty to abstain from

"indiscriminately settl[ing] with one or more of the parties for the full policy limits").

This claim is belied by the record evidence.  Brignoni's injuries were relatively minor: her daughter told USAA on August 8 that she had "some back and neck pain."  Unlike Ilias, Brignoni did not require hospitalization or even seek treatment for her injuries, and never pursued compensation from USAA for bodily injury.  And USAA does not cite to any evidence showing that any of Brignoni's passengers were injured either.  USAA's own corporate representative, Robb Vega, did not reference Brignoni or her passengers, or cite the need to account for competing claims as a reason for USAA's delay in tendering the policy limit.  While Vega initially testified that the delay "may have been due to the ongoing investigation," when asked to provide a specific example of something USAA still needed to learn or obtain, he said, "I wouldn't know," and then admitted, "I don't have an answer."  And the need to account for other potential claims apparently did not prevent Johnson from tendering the policy limit -- he did so immediately upon realizing the extent of Ilias' injuries.  No evidence in the record suggests that a potential claim by Brignoni or her passengers had any impact on USAA's decision whether to settle with Ilias.

Finally, USAA shifts gears and argues that, even if its adjusters did unduly delay in tendering the policy limit, the evidence shows that any delay was merely the result of negligence, and "negligence is not the standard" for a bad faith claim under Florida law. *Harvey*, 259 So. 3d at 9; *accord Eres*, 998 F.3d at 1281.  Contrary to

USAA's suggestion, however, the evidence could reasonably support a finding that the delay was not only caused by negligence. Raymond was aware of Dunbar's liability, and he was aware of the seriousness of Ilias' injuries as early as August 14, yet he refused to tender the policy limit before his retirement on August 30. Raymond claimed in his deposition that he needed to obtain additional "documentation" of Ilias' injuries before he could make an offer, but did not recall that he ever asked Furman for any medical records or a hospital bill and admitted that he disregarded documentation of Ilias' injuries in the police report, which described Ilias' injuries as "incapacitating." And Johnson would later tender the policy limit based on the exact same information that Raymond claimed was insufficient. A reasonable jury could find that Raymond's failure to tender the policy limit was not the result of a simple mistake or negligence. *See Harvey*, 259 So. 3d at 9.

Moreover, even negligent conduct is "relevant to the question of good faith," and must be considered as part of our totality of the circumstances analysis. *Id.* (emphasis omitted) (quotation mark and citation omitted). Evidence that Johnson mistook a torn aorta, multiple broken bones, and a ten-day medically induced coma for a "cervical strain" -- in a case that had already been escalated to a more experienced adjuster because of the severity of the injuries involved, and which had already been pending for over a month -- is surely relevant to the question of bad faith, even if it represents negligence. In our view, a reasonable jury could conclude that such a fundamental failure to apprehend the nature of

Ilias' claim, combined with Raymond's intentional refusal to tender the policy limit for weeks, is sufficient evidence of USAA's failure to act "diligently, and with the same haste and precision as if it were in the insured's shoes" -- the "critical inquiry" in the bad faith analysis. *Id.* at 7.

**2.**

Beyond just the delay in initiating settlement negotiations, evidence also shows that USAA failed to provide Furman and Dunbar with the information they each needed to settle the case. On this point, *Harvey* is illustrative. In that case, GEICO quickly tendered the bodily-injury policy limit following a car accident caused by Harvey, its insured. *Harvey*, 259 So. 3d at 4. The case still did not settle, though, because the claimant was unable to confirm whether Harvey had additional insurance coverage or assets to satisfy an excess judgment. *Id.* at 4-5. The evidence showed that the claimant's attorney had specifically asked for a statement from Harvey indicating whether he had any additional coverage or assets, but GEICO refused to answer, despite such requests being "standard practice." *Id.* at 4, 9. GEICO did not inform Harvey of the request for weeks, and even after it did, it failed to communicate that Harvey intended to comply once he had the chance to speak with his own attorney. *Id.* at 4. Because the claimant's attorney was left in the dark, he testified that he did not wait to file the personal injury suit which resulted in the excess judgment. *Id.* at 5.

Based on this evidence, the Florida Supreme Court affirmed a jury verdict in favor of the insured, holding that the evidence

18                    Opinion of the Court                    21-12486

supported a finding that GEICO had acted in bad faith. *Id.* at 9. The court explained that the duty of good faith requires the insurer to do "everything possible to facilitate settlement negotiations," and the evidence showed that GEICO had fallen short of this obligation by failing to relay important information regarding Harvey's ability to satisfy an excess judgment between Harvey and the claimant's attorney. *Id.* at 8-9; *see also id.* at 10 ("[B]ecause GEICO was handling the claim, Harvey could not contact the [claimant's] estate's attorney directly," and instead "had to use [GEICO] as 'a go-between.'").

Likewise, in this case USAA failed to inform Furman whether Dunbar had any additional insurance coverage to satisfy an excess judgment, despite Furman's request. On August 11, Furman sent USAA a letter asking for a sworn statement "setting forth . . . [t]he name and coverage of any other known insurer" besides USAA. Raymond responded with a disclosure dated August 14 describing USAA's policy, but which did not address the availability of other coverage. Johnson also testified that he sent Furman a standard USAA disclosure form on September 15 which would have indicated that USAA was unaware of any other applicable insurance, but because there is no record evidence to support his assertion, and Furman denies ever having received the disclosure, we must assume for the purposes of summary judgment that Furman never received a disclosure confirming that Dunbar lacked additional coverage. *See Eres*, 998 F.3d at 1278 n.3 (noting that, on

summary judgment, we must "view[] all facts and draw[] all infer-ences in the light most favorable to" the nonmoving party).

Furman then told Johnson on October 12 that she could not accept USAA's offer because she had not received a sworn state-ment confirming that Dunbar lacked additional insurance cover-age. Since Furman testified that she would have advised Ilias to accept the policy limit had USAA provided her with a sworn decla-ration confirming that Dunbar did not have any other available in-surance, the importance of obtaining this information from Dun-bar and providing it to Furman "cannot be overstated." *Harvey*, 259 So. 3d at 9. Yet there is no evidence that Johnson provided Furman with confirmation that Dunbar lacked any additional cov-erage, or even asked Dunbar whether he had any additional cover-age. *See id.* Nor does Johnson appear to have "advise[d] [Dunbar] of any steps he might take to avoid" an excess judgment, such as preparing a coverage affidavit or otherwise conveying to Furman that he had no additional insurance coverage to avoid the need for a deposition. *Bos. Old Colony*, 386 So. 2d at 785. To the contrary, USAA downplayed the risk posed by Ilias' suit after hearing from Furman, informing Dunbar in a letter on October 26 that Ilias' claim was "not expected to[] exceed" his policy's $10,000 bodily-injury limit.

The district court concluded that this evidence could not amount to a finding of bad faith because Johnson's failure to send USAA's standard disclosure form on September 15 was "evidence of some negligence on [USAA's] part -- but nothing more and with

little prejudice to Furman." *Ilias v. USAA Gen. Indem. Co.*, 545 F. Supp. 3d 1296, 1303 (M.D. Fla. 2021). As we've already covered, though, negligence is relevant to the question of bad faith. *See Harvey*, 259 So. 3d at 9. Record evidence shows that USAA first failed to tell Furman whether it was aware of any additional coverage for over a month following its receipt of her August letter, then failed to confirm for Furman that Dunbar lacked additional insurance after Furman spoke with Johnson on October 12. When viewed alongside this evidence, Johnson's failure to send the disclosure on September 15 could support a finding that USAA was not acting with the same "care and diligence" to avoid an excess judgment as a reasonable person would in Dunbar's shoes. *See id.* at 6 (citation omitted).

Nor are we persuaded by USAA's other argument to the contrary. USAA says that it cannot have acted in bad faith because Raymond sent Furman an insurance disclosure on August 14 that complied with Florida Statutes § 627.4137. By its terms, the statute requires an insurer, upon request, to disclose "the name and coverage of each known insurer to the claimant," as well as "[a] statement of any policy or coverage defense which such insurer reasonably believes is available to such insurer." Fla. Stat. § 627.4137(1), (1)(d). Though USAA's disclosure did not state that Dunbar lacked additional insurance coverage, USAA contends that the statutory language does not require an insurer to provide information regarding other insurance policies unless it knows that another policy applies.

Regardless of whether § 627.4137 generally requires an insurer to disclose the existence of other insurance policies,[1] USAA's reference to the statute is a red herring. The evidence shows that, *in this case*, Furman informed USAA that she could not accept the policy limit until she could confirm that Dunbar lacked additional insurance coverage, yet USAA did nothing in its capacity as the "go-between" to facilitate the exchange of that information or to seriously apprise its insured of the risk posed by an excess judgment. *Harvey*, 259 So. 3d at 10 (quotation marks omitted). In light of this evidence, a reasonable jury could conclude that USAA acted as an "impediment" to settlement, rather than doing everything possible to facilitate it. *See id.* at 8-9. Particularly when viewed under the "totality of the circumstances," including USAA's substantial delay in initiating settlement negotiations, we are satisfied that a jury question remains as to whether USAA handled Ilias' claim in bad faith. *See id.* The district court therefore erred in granting summary judgment for USAA on this issue.

## B.

Next up is causation. To show that USAA's bad faith conduct "caused" the excess judgment against Dunbar, Ilias must

---

[1] While the statute speaks of "known insurer[s]" or "known polic[ies]" of insurance, Florida's Second District Court of Appeal has at least twice interpreted § 627.4137(1) to require that an insurer provide a disclosure stating *whether* its insured has any additional coverage. *See Gira v. Wolfe*, 115 So. 3d 414, 418 (Fla. 2d DCA 2013); *Schlosser v. Perez*, 832 So. 2d 179, 180-81, 183 (Fla. 2d DCA 2002).

establish that it "directly and in natural and continuous sequence produce[d] or contribute[d] substantially to producing such [damage], so that it can reasonably be said that, but for the bad faith conduct, the [damage] would not have occurred." *Id.* at 11 (quoting Fla. Std. Jury Instr. (Civ.) 404.6(a)).

As we have previously explained, Furman testified that she could not advise that Ilias accept USAA's offer and release Dunbar from liability without knowing whether Dunbar had any additional coverage that could be used to satisfy an excess judgment. Had USAA provided an affidavit confirming that Dunbar had no additional coverage, Furman would have advised Ilias to accept USAA's offer when it was made in September.

USAA did not provide this information, though, so Furman filed suit to take Dunbar's deposition and confirm under oath that he had no additional insurance. Furman told Johnson this a few days later, when the two spoke on the phone, but USAA still did not provide Furman with the information she needed to settle or take any other steps to obtain that information, instead telling Dunbar that Ilias' suit would not likely exceed his policy limit. The case proceeded to trial, resulting in the excess judgment against Dunbar. As we see it, a reasonable jury faced with this record could find that USAA caused, or at least "contribute[d] substantially," to the entry of the excess judgment against Dunbar. *Id.*; *see also id.* at 9 (evidence showed excess judgment "could have been prevented" where claimant's attorney testified that he would have

delayed filing suit had GEICO informed him that the insured planned to disclose whether he had additional insurance coverage).

USAA's only answer is essentially a retread of the argument we've already rejected concerning Florida Statutes § 627.4137. According to USAA, we should disregard Furman's testimony that she would have accepted USAA's offer to settle had it provided an adequate coverage disclosure because Raymond in fact provided a disclosure that complied with the statute. *See Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013) ("As a general principle, a plaintiff's testimony cannot be discounted on summary judgment unless it is blatantly contradicted by the record . . . ."). But, again, Furman told Johnson that she needed to confirm that Dunbar lacked additional coverage before she could advise Ilias to accept USAA's offer. The fact that USAA provided a disclosure that did not contain this information is not inconsistent with her testimony. *See id.*

Similarly, the district court found Furman's testimony to be incredible because Furman was eventually able to take Dunbar's deposition and confirm that Dunbar lacked additional coverage, yet the case still did not settle. *Ilias*, 545 F. Supp. 3d at 1304. But matters of credibility are for a jury to settle at trial, not a trial court on summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict.").

Moreover, in her deposition, Furman also explained that as the case progressed, Ilias' attorneys' fees and costs continued to rise, impacting his incentive to settle. We therefore do not find Furman's testimony that she would have recommended accepting USAA's settlement offer in September, when it was made, to be inconsistent with the failure of the case to settle months later and after several depositions had been taken, when Ilias' share of any settlement would have been substantially smaller. *See Feliciano*, 707 F.3d at 1253. Had USAA complied with its "duty to initiate settlement negotiations" sooner, or provided Furman with a coverage affidavit before Ilias filed suit, the case may have settled before rising costs changed the calculus. *Harvey*, 259 So. 3d at 7 (quotation mark omitted) (quoting *Powell*, 584 So. 2d at 14). A genuine issue of material fact exists as to whether USAA caused the entry of an excess judgment against Dunbar.

In short, the district court improvidently granted summary judgment to USAA. Material issues of fact as to bad faith and causation remain in dispute and Ilias is entitled to have a jury resolve them. We, therefore, reverse the district court's order and remand for proceedings consistent with this opinion.

**REVERSED and REMANDED.**