[PUBLISH]

In the

# United States Court of Appeals

For the Eleventh Circuit

_____

No. 22-12675

_____

KINSALE INSURANCE COMPANY,

Plaintiff-Counter Defendant
Appellee,

*versus*

PRIDE OF ST. LUCIE LODGE 1189, INC.,
TEAIRA NICOLE REED,

Defendants-Counter Claimants
Appellants.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 2:21-cv-14053-KMM

_____

Before JORDAN, LAGOA, and MARCUS, Circuit Judges.

MARCUS, Circuit Judge:

On Sunday, March 1, 2015, the Pride of St. Lucie Lodge 1189, Inc. (the "Lodge") was operating as a club and bar while hosting a weekend social event. Around 1:00 a.m. on March 2, two groups of female patrons at the Lodge became involved in a fight on the dance floor and were removed from the Lodge out separate exits. The groups nevertheless found each other in the Lodge's back parking lot and the fight continued, culminating in Tanya Oliver being shot in the forehead, all within ten to fifteen minutes after being turned out of the Lodge. She would die from her injuries the following year.

Kinsale Insurance Company ("Kinsale") insured the Lodge. Teaira Reed as representative of the Estate of Tanya Oliver (the "Estate") eventually sued the Lodge on a theory of negligent security. At trial, a jury found the Lodge liable for Oliver's injuries and awarded damages exceeding $3.348 million, an amount far in excess of Kinsale's $50,000 applicable policy sublimit.

The Lodge and the Estate then sued Kinsale for common law bad faith under Florida law. The Lodge and the Estate claim that Kinsale breached its duty of good faith by failing to make a settlement offer within the policy limits before the Estate's claim was filed. The district court granted summary judgment to Kinsale on the ground that Kinsale had no duty to initiate settlement

negotiations because, viewed in the light most favorable to the non-moving parties, no reasonable jury could find that this was a case of "clear liability."

As we see it, however, viewing the evidence in the light most favorable to the Lodge and the Estate, a jury could reasonably find Kinsale knew or should have known liability was clear. Two feuding groups had a physical fight on the Lodge's premises, the Lodge's security simultaneously turned both groups outside into a dark and unmonitored parking lot owned by the Lodge where, almost immediately thereafter, a second, more serious fight erupted, ultimately leading to Oliver being shot. The Lodge's security did nothing to prevent the second fight from occurring or from escalating into a fatal shooting, all within a very short period of time. Moreover, a jury could reasonably find that Kinsale well knew that Oliver had been shot in the head, she remained in critical condition for an extended period of time, and her injuries were catastrophic, with damages reaching far beyond Kinsale's policy limit.

Accordingly, we are required to reverse the entry of summary judgment and remand this cause for trial by jury.

I.

A.

The Lodge is a private clubhouse for a fraternal organization located in Fort Pierce, Florida. On weekends, the building is open and operates as a club and bar between 6:00 p.m. and 2:00 a.m. On such occasions, the Lodge is staffed by a bartender and "a couple of security guys to help handle the crowds." The Lodge has no

paid employees, and the security personnel are volunteers typically working their way into membership at the Lodge. At least one fight had occurred on the Lodge's property as recently as January 2015, less than two months prior to the March 2, 2015 shooting, and Lodge management had previously held meetings expressing concern that the volunteer security guards were standing by when fights occurred. The Lodge's rear parking lot was at the time dark and unmonitored, and the Lodge's leadership had expressed concern about this in the past as well.

The Lodge was insured by two entities. Kinsale provided the Lodge a $1,000,000 surplus lines general liability insurance policy, but limited coverage to $50,000 for any claims that arose out of assault and battery. Separately, Mount Vernon Fire Insurance Company ("Mount Vernon") provided the Lodge with a liquor liability policy, subject to an "absolute firearms exclusion," which stated that the insurance "does not apply to 'injury', including the cost of defense, for any claim or 'suit' arising or resulting from directly, or indirectly, the use of firearms of any kind."

On November 5, 2015 -- some eight months after the March 2, 2015 shooting -- an attorney for the Estate sent a Letter of Representation to the Lodge. On November 23, 2015, the Lodge first informed Kinsale and Mount Vernon about the March 2 shooting. The same day, Kinsale assigned the claim investigation to Senior Claims Examiner Catherine Thrift, who described the claim as "a shooting in the rear parking lot of insured property arising out of an argument that began inside the club." Thrift read two local

news articles about the shooting. The articles both stated that Oliver had been shot in the head in the early hours of Monday, March 2, 2015, after two assailants fired from one vehicle into another, although they contained conflicting information about precisely what had occurred. These articles also said that Oliver remained in critical condition in the ICU after being shot in the head.

On December 2, the Lodge sent the police report from the night of the shooting to Kinsale. As the police report stated, Oliver was found "unconscious but breathing" in the front passenger seat of a vehicle after having "suffered a gunshot wound to her forehead." The report described the shooting as taking place at the Lodge's address and reported that the shooters blocked Oliver's vehicle with an SUV before firing approximately five rounds and driving away. The police report stated that Oliver was transported to the hospital. The report also said that, according to the Lodge's two volunteer security guards, Craig Ferguson and Antonio Andrews, two women had been fighting in the Lodge, were removed, and the fight continued and escalated in the Lodge's parking lot. At one point in the parking lot, one of the women in Oliver's group was struck in the face with a shoe, causing a laceration to her face. The security volunteers told police that the women then separated and continued to their vehicles, and the shooting occurred shortly thereafter.

Thrift then spoke on the phone with the Lodge's representative, Ralph Knight. Knight informed Thrift that "he was not there at [the] time of loss," but confirmed that "workers told him two

individuals started causing a problem and they were asked to leave the building, they left and went into [the] back parking lot where [the] shooting occurred."

Separately, Mount Vernon retained an independent investigation firm, Mitchell Claims Service, Inc. The investigation was performed by Field General Adjuster David Danowit. Danowit's investigation involved reviewing documents, visiting the scene of the shooting, and "talking to as many witnesses as possible." Danowit also agreed to provide Kinsale with the factual results of his investigation as it progressed.

Danowit filed an initial report on December 30, 2015. The report stated that the "incident took place on Monday, March 2, 2015 at around 1:48 AM, in the parking lot of Pride of St. Lucie Lodge #1189." The report detailed interviews with several individuals, including with Ferguson and Andrews, the two volunteer security guards who were at the Lodge on the night of the shooting. In relevant part, Danowit's report summarized his interview with Ferguson this way:

> For the most part, the night was quiet until at around 1:00 AM when a fight broke out in the dance floor just in front of the DJ. The DJ immediately called security through his microphone and both [Ferguson] and Mr. Andrews got there in a matter of seconds. Two girl[s] were going at it full blown and they had to separate them. He recalls there being two separate "posses." He proceeded to escort one girl and her group out

the back door area while Mr. Andrews escorted the other girl and her group through the front door area. He later found out the girl he escorted through the back door was the actual shooter while the other girl escorted by Mr. Andrews was the victim.

When both groups were escorted outside, they made sure everything was okay and they then proceeded to go inside the club area. It was at that time that they decided to go ahead and start asking people to leave as they were going to close the club early. As the club was being closed down, the shooting occurred on the south side area of the club building just outside the gated rear parking lot area. He estimated the shooting occurred about 10–15 minutes after they had broken up the fight inside the club area.

The other security guard, Andrews, "refused to cooperate" with Danowit, but after the Estate filed suit admitted that he was familiar with one of the shooters and knew that she had bragged to him in the past that she was "liable to shoot." Andrews would also later admit that he was aware at the time that the best security practice was not to let two conflicting groups out of the building simultaneously.

Danowit also reported that the Lodge's Chairman of Trustees told him that there was a "prior incident that occurred in the bar area that involved a fight where somebody sustained serious

injuries" in January 2015. Ferguson also told Danowit that "the club has had its share of fights and arguments."

On January 30, 2016, Thrift placed a news article in Kinsale's claims file. The article, which Thrift underlined in red, stated that Oliver remained unable to speak or walk after being shot in the forehead "early last year."

On July 5, 2016, Oliver died from her injuries.

On August 5, 2016, the Estate filed suit against the Lodge for a single count for negligent security in Florida's circuit court for St. Lucie County. Kinsale received a copy of the complaint on August 12, 2016.

On August 15, 2016, Mount Vernon disclaimed coverage to the Lodge subject to their absolute firearms exclusion.

On August 18, 2016, six days after receiving the complaint, but eight months after learning about the shooting, Kinsale tendered its $50,000 Assault and Battery sublimit to the Estate. Kinsale's tender was rejected.

## B.

Following three years of litigation, the case went to trial in state court. On August 23, 2019, the jury assessed seventy percent of the liability to the Lodge, with the balance to the members of Oliver's group. Final judgment was entered against the Lodge for $3,348,623.89.

On February 2, 2021, Kinsale filed the current action in the United States District Court for the Southern District of Florida

seeking a declaratory judgment that the policy's $50,000 Assault and Battery sublimit applied. The Estate and the Lodge counterclaimed for bad faith, arguing that Kinsale breached its duty of good faith by failing to make a settlement offer within the policy limits before the Estate's claim was filed.

The parties eventually agreed that Kinsale had no contractual liability beyond the $50,000 assault and battery sublimit. Kinsale then moved for summary judgment on the bad faith counterclaim.

On July 14, 2022, the district court granted summary judgment to Kinsale on the ground that "no reasonable jury could conclude that Kinsale acted in bad faith in handling the Lodge's claim."

This timely appeal followed.

## II.

"We review the district court's grant of summary judgment *de novo*, viewing all evidence and drawing all reasonable factual inferences in favor of the nonmoving party." *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012) (citing *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc)). "Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *Id.* "It is not the court's role to weigh conflicting evidence or to make credibility determinations; the non-movant's evidence is to be accepted for purposes of summary judgment." *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).

A.

The sole issue in this appeal is whether the district court erred in granting summary judgment to Kinsale on the bad faith claim.

In diversity cases, we are *Erie*-bound to apply the substantive law of the forum state, in this case, Florida. *Ilias v. USAA Gen. Indem. Co.*, 61 F.4th 1338, 1344 (11th Cir. 2023); *Mesa v. Clarendon Nat'l Ins. Co.*, 799 F.3d 1353, 1358 (11th Cir. 2015). Consequently, this Court is bound by the decisions of Florida's highest court, as well as the decisions of Florida's intermediate appellate courts "unless there is persuasive evidence that the highest state court would rule otherwise." *King v. Ord. of United Com. Travelers of Am.*, 333 U.S. 153, 158 (1948); *see also Mesa*, 799 F.3d at 1358 n.5; *Bravo v. United States*, 577 F.3d 1324, 1325 (11th Cir. 2009) (per curiam).

Florida law imposes upon an insurer, when handling the defense of a claim against the insured, "a duty to use the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business." *Bos. Old Colony Ins. Co. v. Gutierrez*, 386 So. 2d 783, 785 (Fla. 1980); *see also Campbell v. Gov't Emps. Ins. Co.*, 306 So. 2d 525, 530–31 (Fla. 1974) ("[R]easonable diligence and ordinary care [a]re material in determining bad faith."). These obligations are examined under the "totality of the circumstances." *Harvey v. GEICO Gen. Ins. Co.*, 259 So. 3d 1, 7 (Fla. 2018) (citation omitted). Whether the totality of the circumstances indicates that an insurer acted in bad faith "usually [is] [an] issue[ ] of fact to be determined by a fact-finder." *Vest v.*

*Travelers Ins. Co.*, 753 So. 2d 1270, 1275 (Fla. 2000); *see also Campbell* 306 So. 2d at 530 ("Bad faith in a factual situation of this kind is not a matter of law but is a question of fact for the jury.").

Since an insurer in such a position is held to the standard of a "reasonably prudent person," and "the duty of good faith involves diligence and care in the investigation and evaluation of the claim," *Bos. Old Colony Ins. Co.*, 386 So. 2d at 785, an evaluation of bad faith is an objective one, based on what the insurer knew at the time, as well as what the insurer reasonably should have known, *see, e.g.*, *Delancy v. St. Paul Fire & Marine Ins. Co.*, 947 F.2d 1536, 1545 (11th Cir. 1991).

One such circumstance is that "[w]here liability is clear, and injuries so serious that a judgment in excess of the policy limits is likely, an insurer has an affirmative duty to initiate settlement negotiations." *Powell v. Prudential Prop. & Cas. Ins. Co.*, 584 So. 2d 12, 14 (Fla. 3d DCA 1991) (per curiam); *see also Harvey*, 259 So. 3d at 7 (recognizing the *Powell* rule). In these circumstances, the financial exposure to the insured acts as a "ticking financial time bomb" and "[a]ny delay in making an offer . . . even where there was no assurance that the claim could be settled could be viewed by a fact finder as evidence of bad faith." *Goheagan v. Am. Vehicle Ins. Co.*, 107 So. 3d 433, 439 (Fla. 4th DCA 2012).[1]

---

[1] As a preliminary matter, the district court appears to have incorrectly concluded that the "totality of the circumstances" analysis is only triggered once *Powell* is satisfied as a threshold matter. In other words, the district court seems to have treated *Powell* as a narrow exception to the rule that, without a

Florida's courts have provided guidance about the meaning of the word "clear" by using the synonym "obvious." *Powell*, 584 So. 2d at 14 (citing *Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am.*, 323 A.2d 495 (N.J. 1974)) ("[W]here substantial injuries and potential liability of insured are obvious, failure to offer policy limits constitutes bad faith even where there is no assurance that action can be settled[.]"); *Goheagan*, 107 So. 3d at 438 (same). Florida's state courts have also cited to John A. Appleman, *Insurance Law and Practice* § 4711 (Buckley ed. 1979) (hereinafter "Appleman"). *See Powell*, 584 So. 2d at 14; *Goheagan*, 107 So. 3d at 439. Appleman offers the same synonym for clear, "obvious." *See generally* Appleman § 4711 (using the phrases "where liability is clear" and "where liability was reasonably obvious" interchangeably in a discussion of the insurer's duty to settle).

But what does "obvious" mean? The Supreme Court of Florida has held that "words not expressly defined are given their plain and ordinary meaning." *Metro. Dade Cnty. v. Green*, 596 So. 2d

---

settlement offer, an insurer cannot be liable for bad faith. However, "Florida courts have long since replaced the offer-of-settlement requirement with a totality of the circumstances approach, using the presence or absence of an offer to settle as one of the appropriate criteria." *Snowden ex rel. Estate of Snowden v. Lumbermens Mut. Cas. Co.*, 358 F. Supp. 2d 1125, 1127 (N.D. Fla. 2003). *Powell* is itself part of the totality of the circumstances test. *Harvey*, 259 So. 3d at 7; *see also Powell*, 584 So. 2d at 13 (holding that claimant's failure to make a settlement demand and subsequent rejection of insurer's tender of policy limits "are only two of a number of circumstances to be weighed by the fact-finder"). To the extent the district court read *Powell* to have created a standalone threshold test for bad-faith liability in a no-offer case, the district court erred.

458, 458 (Fla. 1992) (per curiam); *see also Parrish v. State Farm Fla. Ins. Co.*, 356 So. 3d 771, 775 (Fla. 2023) (collecting cases). "If necessary, the plain and ordinary meaning of the word can be ascertained by reference to a dictionary." *Green v. State*, 604 So. 2d 471, 473 (Fla. 1992); *see also State v. Kinchen*, 490 So. 2d 21, 22 (Fla. 1985) (using dictionary definition to define "fairly" in the context of the "fairly susceptible test," a common law standard about comments on the defendant's failure to testify, where prior court had not defined the word "fairly" when creating the test); *State v. Grissom*, 492 So. 2d 1324, 1325 (Fla. 1986) (same).[2] Thus, we turn to the ordinary meaning of the word. "Obvious" means a thing is "easily discovered, seen, or understood." *Obvious*, Merriam-Webster, https://perma.cc/E7L4-A2SY; *see also Obvious*, Oxford English Dictionary, https://www.oed.com/dictionary/obvious_adj (last

---

[2] *Erie*-bound federal circuit courts of appeal also regularly rely on dictionary definitions to determine the plain meaning of words in state common law. *See, e.g., Ed Peters Jewelry Co. v. C & J Jewelry Co.*, 215 F.3d 182, 191 (1st Cir. 2000) (relying on dictionary definition of "fraud" to determine whether conduct was "fraud" for the purpose of Rhode Island's common law successor liability); *Buczek v. Cont'l Cas. Ins. Co.*, 378 F.3d 284, 291 (3d Cir. 2004) (relying on dictionary definitions of "imminent" to interpret New Jersey common law rule under which "collapse" always includes "imminent collapse" for the purposes of insurance policies); *Kaiser Aluminum & Chem. Corp. v. Westinghouse Elec. Corp.*, 981 F.2d 136, 147 & n.8 (4th Cir. 1992) (relying on dictionary definition of "calamitous" where West Virginia's strict liability tort common law requires a "sudden calamitous event" attributable to a product's dangerous defect); *Reid ex rel. Reid v. Norfolk & W. Ry. Co.*, 157 F.3d 1106, 1112 (7th Cir. 1998) (considering a dictionary definition of "limited" in the context of Illinois's "limited area" test related to the duty owed to trespassers under common law negligence).

visited Jan 5, 2024) (defining "obvious" as "[p]lain and evident to the mind; perfectly clear or manifest; plainly distinguishable; clearly visible"); *Obvious*, Collins Dictionary, https://www.collins-dictionary.com/us/dictionary/english/obvious (last visited Jan. 5, 2024) ("If something is *obvious*, it is easy to see or understand.").

Dictionary definitions of "clear" are altogether consonant with this understanding. *See, e.g.*, *Clear*, Collins Dictionary, https://www.collinsdictionary.com/us/dictionary/english/clear (last visited Jan. 5, 2024) ("Something that is *clear* is obvious and impossible to be mistaken about."); *Clear*, Merriam-Webster, https://perma.cc/RWP5-PJRE (defining "clear" variously as "free from obscurity or ambiguity," or "easily understood").

Finally, the cases that Florida courts have cited as involving "clear liability" involve fact patterns where liability could be described as obvious. *See, e.g.*, *Berges v. Infinity Ins. Co.*, 896 So. 2d 665, 669, 681 (Fla. 2004) (describing a case where the driver of the insured car was intoxicated and crossed the center line, causing a collision, as "a case of clear, if not aggravated, liability"); *Goheagan*, 107 So. 3d at 436, 439 (describing case where insured was driving with a 0.19 blood alcohol percentage and rear-ended a line of cars stopped at a red light at sixty miles per hour as a case of "clear liability"); *Powell*, 584 So. 2d at 13 (describing a case where driver of insured vehicle struck two pedestrians from behind, and was evaluated at "80-100%" liability, as a case of "clear liability"); *Robinson v. State Farm Fire & Cas. Co.*, 583 So. 2d 1063, 1064, 1069 (Fla. 5th DCA 1991) (describing fact pattern where insured ran a stop sign,

causing severe injury, as one of "clear liability on the part of [the] insured" sufficient to reverse summary judgment for the insurer in a bad faith case). This is not to say that we understand the question to be whether the insured's liability is 100% guaranteed. As we previously described, Florida's courts have cited approvingly to Appleman's *Insurance Law and Practice*, which explains that "where liability is clear and the injuries serious so that a judgment in excess of policy limits is a likely *possibility*, the duty to make a good faith effort to negotiate a settlement is clear." Appleman § 4711 (emphasis added); *see also Powell*, 584 So. 2d at 14 (citing Appleman); *Goheagan*, 107 So. 3d at 439 (same).

The question here boils down to whether a jury could reasonably find that the Lodge's liability was clear prior to the Estate having filed suit. To be certain, we do not decide whether -- as a factual matter -- the Lodge's liability *was* "clear." We hold only that a jury could reasonably so find when presented with this fact pattern.

For starters, there is no question that the Lodge has a duty to protect its patrons. Under Florida law, the Lodge owes all of its patrons a duty of reasonable care for their safety based on premises liability. *Hall v. Billy Jack's, Inc.*, 458 So. 2d 760, 761 (Fla. 1984). This duty includes an obligation to take reasonable steps to protect its patrons from foreseeable "disorderly conduct by third persons . . . which might endanger the safety of patrons." *Id.* at 762. In particular, under controlling Florida law, the proprietor of a bar, "although not an insurer of his patrons' safety, is bound to use every

reasonable effort to maintain order among his patrons, employees, or those who come upon the premises and are likely to produce disorder to the injury or inconvenience of patrons lawfully in his place of business." *Stevens v. Jefferson*, 436 So. 2d 33, 34 (Fla. 1983). This duty also includes taking all reasonable steps to mitigate both generalized dangers, as well as specific risks to individual patrons or risks caused by specific individuals that the establishment knew or should have known about. *Id.*

This duty to protect patrons also includes maintaining adequate security staffing to prevent foreseeable danger, even if that danger is targeted at one particular patron. *See Hall*, 458 So. 2d at 762; *Merrill Crossings Assocs. v. McDonald*, 705 So. 2d 560, 562–63 (Fla. 1997) ("[I]t would be irrational to allow a party who negligently fails to provide reasonable security measures to reduce its liability because there is an intervening intentional tort, where the intervening intentional tort is exactly what the security measures are supposed to protect against."). An establishment's duty to provide security includes taking reasonable safety measures such as monitoring places like the establishment's parking lot if danger there is foreseeable. *See Foster v. Po Folks, Inc.*, 674 So. 2d 843, 846 (Fla. 5th DCA 1996) ("Adding to the potential dangerousness of the parking lot . . . was the fact that there are no security cameras, no guards, and no window that looks onto the parking lot from the restaurant which would allow visual contact with the parking lot from the restaurant.").

Although the duty to protect patrons applies only to "the premises" of the establishment, it is also clear under Florida law that "'the premises' may not be limited to the area actually owned or leased by the [establishment] [if] its business activities extended beyond its legal boundaries." *Holiday Inns, Inc. v. Shelburne*, 576 So. 2d 322, 329 (Fla. 4th DCA 1991) (quoting *Ember v. B.F.D., Inc.*, 490 N.E.2d 764, 772 (Ind. Ct. App. 1986), *overruled in part on other grounds by Angrand v. Key*, 657 So. 2d 1146 (Fla. 1995)). Instead, the duty of reasonable care extends to a "foreseeable zone of risk," including nearby parking lots and street parking that the establishment knows are regularly used by its patrons in connection with its business. *Borda v. E. Coast Ent., Inc.*, 950 So. 2d 488, 491 (Fla. 4th DCA 2007) (quoting *McCain v. Fla. Power Corp.*, 593 So. 2d 500, 503 (Fla. 1992)); *Shelburne*, 576 So. 2d at 329. Thus, notably, the Supreme Court of Florida has upheld the proprietor's duty to protect patrons in cases where a fight began inside a bar but "moved outside," where a second assault took place after the first fight was over. *Hall*, 458 So. 2d at 761.

The scope of the foreseeable zone of risk is bounded not only by proximity to the establishment, but also by time. *Chateloin v. Flanigan's Enters. Inc.*, 423 So. 2d 1002 (Fla. 3d DCA 1982). For example, in *Holiday Inns, Inc. v. Shelburne*, two groups of patrons were walking from a bar to their respective vehicles when a fight broke out. *Shelburne*, 576 So. 2d at 324. The brawl spilled over into an adjacent lot, and eventually three people were shot. *Id.* Florida's Fourth District Court of Appeal found that the establishment's duty of care still applied, because "the jury could have found that

18                    Opinion of the Court                    22-12675

the confrontation began on [the establishment's] property and spilled over onto the adjacent parking lot, and that the shooting occurred only minutes after the individuals had crossed the property line." *Id.* at 328.

A bar's duty of care is particularly salient where, as here, the establishment itself ejects the feuding parties from the bar at the same time into the same general place. In *Borda v. East Coast Entertainment, Inc.*, the plaintiff was twice attacked by other patrons inside a bar. *Borda*, 950 So. 2d at 489. Bouncers separated the women each time. *Id.* The second time, both women were ejected from the bar's premises and placed outside the bar on the sidewalk near each other. *Id.* The plaintiff asked the bar's security guard for help, but the guard walked away. *Id.* The plaintiff then walked down a nearby alley, where she was again attacked by the same patrons. *Id.* at 489-90. Reversing the trial court's conclusion that the plaintiff was not entitled to any damages for injuries that took place outside the bar, the Fourth District Court of Appeals emphasized that the injuries outside the bar fell within "a foreseeable zone of risk, especially when both patrons were ejected at the same time and placed in the same area." *Id.* at 491. The court held that it was reasonable for the jury to find that the bar's ejection of both patrons simultaneously and the security guard's subsequent inaction were the proximate causes of the plaintiff's injuries. *Id.* at 492.

### B.

Taking the admissible evidence in this record in the light most favorable to the non-moving parties and drawing all

reasonable inferences in the same way (as we must on summary judgment), and applying the facts to Florida's well-settled tort law, a jury could reasonably find that liability was clear. The following specific facts were known or should have been known to Kinsale prior to the commencement of the lawsuit:

(1) The Lodge used volunteer guards as security, and Lodge leadership had previously held meetings regarding concerns that their security guards were standing by when fights occurred. The Lodge's rear parking lot was dark and typically unmonitored, and the Lodge's leadership had expressed concern about this in the past as well. At least one other fight had taken place on the Lodge's property in January 2015, less than two months prior to the shooting.

(2) A physical altercation between two women occurred at the Lodge around one o'clock in the morning of March 2, 2015. The women and their groups were separated by the Lodge's security almost immediately. One of the guards was familiar with one of the shooters and knew that she had bragged to him in the past that she was "liable to shoot." The security guards led one group out the front door and another group out the back door. At least one of the volunteer security guards was aware that the best practice was to not let two conflicting groups out simultaneously.

(3) Once outside, the two groups found each other almost immediately in the rear parking lot of the

Lodge and initiated a second fight. The second fight was a brawl between both groups. At least one woman used her shoe as a weapon and struck another woman in the face, causing a laceration. It is unclear whether a security guard saw the second fight and did nothing, or whether the guards placed both groups outside the bar and immediately went back inside before either group left the Lodge's property. If a guard did observe the second fight and stood idly by, then such willful inaction could lead a jury to reasonably find the Lodge's liability for negligent security was clear. If, however, the guards had placed both feuding groups outside and immediately went back inside before they saw whether either group had safely left their property, this too would allow a jury to reasonably find that the Lodge's liability for negligent security was clear. In any event, neither of the Lodge's security guards intervened in the second fight, and the fight continued until the warring groups broke apart on their own. Eventually, the shooters' group walked away from the Lodge to where they were parked down the street. The decedent's group got into their car, which was parked in the rear parking lot.

(4) Before the decedent's group could exit the Lodge's parking lot, the shooters returned in their car onto the Lodge's property and blocked the decedent's group's exit. Two shooters then rolled down their windows and fired approximately five rounds through the front windshield of the decedent's

vehicle. The decedent was struck in the forehead and would remain comatose for over a year. The shooters then sped away. Notably, the time that elapsed between security removing both groups of women and when the shots were fired was only ten to fifteen minutes.

Indeed, a jury would be further aided in reasonably reaching this conclusion by considering the testimony of the appellants' expert witnesses, Lewis N. Jack and Daniel Doucette. Jack is an attorney specializing in civil litigation, including premises liability and negligent security. His expert report states that "[t]he claim as described in Ms. Thrift's notes to file and her correspondence, from November 23 through December 3, 2015, presents a case where negligent security premises liability is clear." Jack's report further opines that "[t]he facts known to Kinsale presented a classic case for bar liability" and that Kinsale's "failure to . . . appreciate the Lodge's exposure to a seven figure verdict is inexplicable." In deposition, Jack testified that "this was a classic bar fight that -- by the very facts that were presented would tell us, look, this is a matter involving negligent security issues."

Doucette is a semi-retired consultant specializing in insurance coverage and bad faith. In a deposition, Doucette said that, based on what Kinsale knew from corresponding with Danowit, there was "nothing left that [Kinsale would] absolutely need to know to decide that a $50,000 policy ought to be offered."

The evidence adduced also included deposition testimony taken from Peter Alfeche, the claims handler for Mount Vernon.

Alfeche opined that, had he been in the shoes of Kinsale, he would have tendered the $50,000 sublimit before the lawsuit was filed based on the pre-suit investigation "[b]ecause they had a $50,000 sublimit, it's reported that the injuries were very serious, and also because you're dealing with a negligent security case in Florida" where "[y]ou get a lot of big verdicts in the negligent security cases, and very seldom will you get a defense verdict."

Kinsale nevertheless asserts that evidence uncovered during the investigation made liability unclear as a matter of law. However, Kinsale does not convince us that any of the following pieces of evidence would bar a jury from reasonably finding that liability was clear.[3]

First, Kinsale claims that the shooting did not occur on the Lodge's property, but this argument is directly contradicted by the police report, the Danowit report, at least one of the newspaper articles Thrift read, and the notes of Thrift herself, all of which state that the shooting took place in the Lodge's parking lot or at

---

[3] Indeed, to the extent the dissent acknowledges that there is a "factual dispute as to the Lodge's liability before suit was filed," Dissent at 17, this factual dispute would plainly bar the entry of summary judgment in Kinsale's favor, since the entry of summary judgment requires that "there are no genuine issues of material fact." *Strickland*, 692 F.3d 1151, 1154 (11th Cir. 2012) (citing *Chapman*, 229 F.3d at 1023). We are vacating and remanding the district court's grant of summary judgment in the Lodge's favor for this very reason -- there are material factual disputes about whether the Lodge's liability was clear. And as we see it, the dissent has conflated the legal interpretation Florida's courts have given to the word "clear" with whether the facts were sufficient to allow a jury to find clarity in this case.

22-12675                Opinion of the Court                23

its address.    And even if Kinsale did uncover evidence that the shooting took place off of the Lodge's property, liability could still be clear under Florida's premises liability laws if the shooting took place within a foreseeable zone of risk. *See Shelburne*, 576 So. 2d at 328–29; *Borda*, 950 So. 2d at 491.

Second, Kinsale argues that the shooting took place after the Lodge had closed. Again, this assertion is contrary to at least some of the information Kinsale had available during the investigation: Thrift's notes themselves state that "there is some discrepancy on whether or not the club was open at the time." In any event, however, even if the Lodge had just closed, by all accounts, the shooting took place only ten to fifteen minutes after the patrons were expelled, and the Lodge's duty to protect its patrons did not end the moment it closed. *See Shelburne*, 576 So. 2d at 324 (holding that hotel bar was liable for negligent security despite combatants having left the bar "at closing time").

Third, Kinsale says that the shooting occurred after the warring parties were ejected from the premises, making them trespassers. Again, there is a factual question about whether this was true: Oliver had been ejected from the Lodge's building, but never left the Lodge's property entirely and she was shot within a matter of minutes of leaving the building. The fact that the parties were brawling could not alone transform Oliver and her party into trespassers. *See Byers v. Radiant Grp., L.L.C.*, 966 So. 2d 506, 509–10 (Fla. 2d DCA 2007) ("We find no support in Florida law for the proposition that a store patron can lose his status as an invitee and become

an uninvited licensee or trespasser merely because he or she engages in a violent act or acts against other customers on the store's premises. Indeed, to the extent that Florida case law addresses this issue at all, it is to the contrary."). The jury in the underlying liability case tried in the state court ultimately found that Oliver was not a trespasser. But even if Kinsale was correct that the parties were trespassers at the time of the shooting, this would still not make liability unclear as a matter of law, because the Lodge could still potentially be liable for gross negligence if the Lodge knew Oliver was in the parking lot into which it had turned her out. *See Nicholson v. Stonybrook Apartments, LLC*, 154 So. 3d 490, 492 (Fla. 4th DCA 2015).

Fourth, Kinsale argues that the shooters left the Lodge's premises completely and then returned to the Lodge and shot Oliver, thus breaking the chain of causation. But Oliver's group never left the Lodge's premises, and the shooting occurred only after two rounds of fights, both on the Lodge's property, one fight leading to the other and culminating in a shooting, all within ten to fifteen minutes. As we have already discussed, Florida's courts recognize a foreseeable zone of risk where one fight spills outside of a bar's property and then a second fight begins outside afterward, *Hall*, 458 So. 2d at 761, where a brawl takes place after closing time in a nearby parking lot, *Shelburne*, 576 So. 2d at 329, or where feuding parties are expelled and an assault later takes place in a nearby ally, *Borda*, 950 So. 2d at 491. A break in causation, on the other hand, occurs where an assault between patrons happens miles from the establishment after significant time has passed. *Chateloin*, 423 So.

2d at 1002.  On this record, we cannot conclude that this case so clearly belongs in the latter category as to hold that the Lodge's liability was unclear as a matter of law.

Fifth and finally, Kinsale attributes significance to the fact that the shooting occurred when Oliver was trying to leave the premises and that both groups had been drinking alcohol.  But we see no reason that the Lodge's premises liability would be affected by the fact that Oliver was on her way out when she was shot in the Lodge's parking lot.  Kinsale points to no Florida law to that effect.  And the fact that the patrons had been drinking is not alone helpful to Kinsale, because the Lodge was serving the alcohol that was consumed and was acting as a bar, and therefore it had a particular duty to "use every reasonable effort to maintain order among [its] patrons." *Stevens*, 436 So. 2d at 34.

Moreover, the injuries in this case were catastrophic and this critical fact was well-known by Kinsale from the outset. Oliver was shot in the forehead.  Thrift's notes from the day the claim was opened included newspaper articles recounting the extent of Oliver's injuries.  Kinsale's awareness of the severity of Oliver's injuries was reinforced by the January 30, 2016 newspaper article Thrift added to Kinsale's claims file, which stated that Oliver remained unable to walk or speak nearly a year after the shooting.  There can be no dispute that Kinsale knew the damages greatly exceeded the comparatively small $50,000 assault and battery sublimit.  Indeed, the jury ultimately awarded the Estate a judgment of $3,348,623.89 from the Lodge, more than sixty-five times Kinsale's policy limit.

Under well-settled Florida law, the scope of the damages when compared to the sublimit, too, is considered under the totality of the circumstances as one of a "number of circumstances to be weighed by the fact-finder" in determining bad faith.  *See Powell*, 584 So. 2d at 13; *see also Harvey*, 259 So. 3d at 7.

The financial exposure to Kinsale in this case was "a ticking financial time bomb," and "[a]ny delay in making an offer . . . even where there was no assurance that the claim could be settled could be viewed by a fact finder as evidence of bad faith." *Goheagan*, 107 So. 3d at 439.  "[I]t is for the jury to decide whether the insurer failed to 'act in good faith with due regard for the interests of the insured.'" *Harvey*, 259 So. 3d at 7 (quoting *Bos. Old Colony Ins. Co.*, 386 So. 2d at 785).  All told, a jury could reasonably find that Kinsale acted in bad faith in failing to tender its policy limit prior to the Estate filing suit.  The district court erred in taking the case away from a jury, holding that as a matter of law, a jury could not find that Kinsale acted in bad faith.  On remand, the jury must decide whether -- considering the totality of the circumstances -- Kinsale acted in bad faith.  *See Berges*, 896 So. 2d at 680 ("In Florida, the question of whether an insurer has acted in bad faith in handling claims against the insured is determined under the 'totality of the circumstances' standard." (citation omitted)); *Am. Builders Ins. Co. v. S.-Owners Ins. Co.*, 71 F.4th 847, 854 (11th Cir. 2023) ("The bad faith inquiry 'is determined under the "totality of the circumstances" standard.'" (citing *Harvey*, 259 So. 3d at 7)).

Summary judgment was unwarranted.[4]

---

[4] We also DENY Kinsale's Motion for Certification of the questions about the meaning of "clear liability" to the Supreme Court of Florida. At no point up to and including oral argument did either party raise any issue of certifying a question to the Supreme Court of Florida. This Court sua sponte raised the question in oral argument, at which time all of the parties said there was no need to certify any question to the Supreme Court of Florida because its law was clear. Two weeks later, Kinsale filed a Motion for Certification. Both the Estate and the Lodge objected.

We do not think it is necessary to certify this case and send the question of what "clear liability" means to the Supreme Court of Florida because "[t]his clearly is not a case in which we are required to 'guess' state law from one or two questionable precedents." *Fla. ex rel. Shevin v. Exxon Corp.*, 526 F.2d 266, 275 (5th Cir. 1976). Florida's law on bad faith liability is sufficiently well-settled. As we have previously explained, Florida's appellate courts have told us that "clear" means "obvious," a definition that is altogether consistent with the ordinary meaning of the word. Applying the facts in this case, a jury could reasonably find that the Lodge's liability was clear.

In urging certification, our dissenting colleague suggests that "we cannot assume that this silence means that Florida's highest court approves -- or disapproves -- of that line of cases." Dissent at 3. But this argument misses the mark, since the dissent has offered no "persuasive evidence" that the Florida Supreme Court would rule contrary to Florida's intermediate appellate courts, which have spoken about this idea with considerable clarity. *King*, 333 U.S. at 158. And in the absence of that evidence, we are bound by those decisions. *See, e.g.*, *Turner v. Wells*, 879 F.3d 1254, 1262 (11th Cir. 2018) (noting that "we must follow the decisions of these intermediate courts" unless "persuasive evidence demonstrates that the highest court would conclude otherwise"); *Mesa*, 799 F.3d at 1358 n.5 (same); *Guarino v. Wyeth, LLC*, 719 F.3d 1245, 1251 (11th Cir. 2013) (same); *State Farm Mut. Auto. Ins. Co.*, 648 F.3d 1216, 1224 (11th Cir. 2011) (same); *Pendergast v. Sprint Nextel Corp.*, 592 F.3d 1119, 1133 (11th Cir. 2010) (same); *Bravo*, 577 F.3d at 1326 (same).

---

We subsequently received a Motion for Leave to File an amicus curiae brief in support of Kinsale's Motion for Certification filed by the American Property Casualty Insurance Association ("APCIA"). The Motion has been opposed by the Lodge and the Estate.

APCIA's Motion is DENIED. The Federal Rules of Appellate Procedure consistently provide that the time for filing a motion for leave to file an amicus brief is "no later than 7 days" after the brief or petition for rehearing being supported is filed. Fed. R. App. P. 29(a)(6), (b)(5). The Rule's language is unambiguous and mandatory: "An amicus curiae *must* file its brief, accompanied by a motion for filing when necessary, no later than 7 days after the principal brief of the party being supported is filed." Fed. R. App. P. 29(a)(6) (emphasis added). There is nothing precatory about the verb form "must" used in the rule. This Court has long interpreted the word "must" to mean mandatory and exclusive. *See, e.g.*, *Dietrich v. Key Bank, N.A.*, 72 F.3d 1509, 1515 (11th Cir. 1996) (contrasting "must" with the "permissive 'may'"). The Eleventh Circuit's own rules of procedure are entirely consistent with the mandatory nature of these deadlines. *See* 11th Cir. R. 29-3 ("An amicus curiae must file its proposed brief, accompanied by a motion for filing when necessary, no later than seven days after the petition for rehearing en banc being supported is filed."); 11th Cir. R. 29-4 ("An amicus curiae must file its proposed brief, accompanied by a motion for filing when necessary, no later than seven days after the petition for panel rehearing being supported is filed."). The deadline for filing a motion for leave to file an amicus brief in support of Kinsale's motion to certify was December 27, 2023. Instead, APCIA filed its Motion on January 12, 2024, fully sixteen days after the deadline had passed. APCIA's Motion is untimely. While we retain the general power pursuant to Rule 26(b) to permit an untimely filing, this exception applies only "[f]or good cause." Fed. R. App. P. 26(b); *see also* Fed. R. App. P. 29 advisory committee's note to 1998 amendment. APCIA has made no showing of good cause, or even acknowledged that its Motion is late. In any event, we remain unconvinced that it is necessary to certify this case to the Supreme Court of Florida for the reasons we have already explained.

**REVERSED AND REMANDED.**

22-12675                LAGOA, J., Dissenting                1

LAGOA, Circuit Judge, dissenting:

I respectfully dissent from the majority's decision to reverse the district court's entry of summary judgment in favor of the Pride of St. Lucie Lodge 1189, Inc. (the "Lodge").  While I agree with some of the majority opinion, I part ways on two main issues.  First, I do not share the majority's confidence in the clarity of Florida law as to when an insured's liability is clear for the purposes of determining when an insurer is obligated to initiate settlement negotiations.  And second, even if the majority is correct that we have sufficient guidance from Florida courts, this case is unlike those where courts have found an insurer has a duty to initiate settlement negotiations under *Powell v. Prudential Property & Casualty Insurance Co.*, 584 So. 2d 12 (Fla. Dist. Ct. App. 1991).  On these facts, a reasonable jury could not infer bad faith from Kinsale Insurance Company's ("Kinsale") delay in settlement negotiations because that delay was not "willful and without reasonable cause."  *Id.* at 14.  I therefore would certify a question to the Florida Supreme Court or, in the alternative, affirm the district court's entry of summary judgment.

**I.**

I start with where I agree with the majority.  When evaluating whether an insurer acted in bad faith, I agree that we conduct an objective inquiry, "based on what the insurer knew at the time, as well as what the insurer reasonably should have known."  Maj. Op. at 11; *see Bos. Old Colony Ins. Co. v. Gutierrez*, 386 So. 2d 783, 785 (Fla. 1980).  And I agree with the majority that, even in cases in which a claimant has not made a demand on the policy, we still

conduct a "totality of the circumstances" inquiry. *See* Maj. Op. at 10. Finally, I also agree with the majority that Tanya Oliver's injuries were catastrophic and that it "[w]as likely" before suit was filed that any judgment would be "in excess of the policy limits." *Powell*, 584 So. 2d at 14. Thus, the majority correctly focuses on whether a reasonable jury could find that the Lodge's liability was clear before suit was filed.

## II.

Moving to the sources of my disagreement, I first explain why I believe this question merits certification to the Florida Supreme Court. I then explain why, even if the majority is correct that Florida law is sufficiently clear on this point, it errs in concluding that a reasonable jury could find this to be a case of clear liability.

## A.

Certification not only "produces definitive answers," but it also "helps build a cooperative judicial federalism." *Fla. ex rel. Shevin v. Exxon Corp.*, 526 F.2d 266, 274 (5th Cir. 1976)[1] (quoting *Lehman Bros. v. Schein*, 416 U.S. 386, 391 (1974)). "[B]ecause a state's highest court is the one true and final arbiter of state law," only it "can provide what we can be assured are 'correct' answers to state law questions." *Miss. Valley Title Ins. Co. v. Thompson*, 754 F.3d

---

[1] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981.

1330, 1334 (11th Cir. 2014) (quoting *Forgione v. Dennis Pirtle Agency, Inc.*, 93 F.3d 758, 761 (11th Cir. 1996)).  Thus, when "substantial doubt exists about the answer to a material state law question upon which the case turns," we should certify the question to the applicable state supreme court to get the correct answer.  *Id.* (quoting *Forgione*, 93 F.3d at 761).  This course is wisest when the unsettled legal issue at hand is likely to recur in future cases, *Exxon Corp.*, 526 F.2d at 275 n.29, and when the outcome of the case has "policy implications" for the forum state, *Altman Contractors, Inc. v. Crum & Forster Specialty Ins. Co.*, 832 F.3d 1318, 1326 (11th Cir. 2016).

The majority concludes that certification is not warranted because, in its eyes, "Florida's law on bad faith liability is sufficiently well-settled."  Maj. Op. at 27 n.4.  In other words, it says that this case is clearly not one "in which we are required to 'guess' state law from one or two questionable precedents."  *Id.* (quoting *Exxon Corp.*, 526 F.2d at 275).  But the majority fails to point to one decision explaining when liability is clear for the purposes of *Powell*. Nor has the Florida Supreme Court addressed *Powell* and related, subsequent decisions from Florida's intermediate appellate courts. Because the Florida Supreme Court has limited jurisdiction to review decisions by Florida's lower courts, we cannot assume that this silence means that Florida's highest court approves—or disapproves—of that line of cases.  And given the importance of this area of Florida insurance law coupled with the Florida Supreme Court's

4                    Lagoa, J., Dissenting                22-12675

critique of our occasional forays into it,[2] that is another factor that weighs in favor of certification.[3]

In the absence of guidance from the Florida Supreme Court, the majority starts with opinions from two of Florida's district courts of appeal: *Powell* itself and *Goheagan v. American Vehicle Insurance Co.*, 107 So. 3d 433 (Fla. Dist. Ct. App. 2012). In these opinions, the courts cited, among other things, a decision of the Supreme Court of New Jersey, *Rova Farms Resort, Inc. v. Investors Insurance Co. of America,* 323 A.2d 495 (N.J. 1974), and a treatise, John A. Appleman, *Insurance Law and Practice* § 4711, at 383 (rev. ed. 1979). *Powell*, 584 So. 2d at 14; *Goheagan*, 107 So. 3d at 438–39. Both courts described *Rova Farms* as a case about when an insurer could be liable for the failure to settle where "substantial injuries [to the claimant] and potential liability of [the] insured are obvious." *Powell*, 584 So. 2d at 14; *Goheagan*, 107 So. 3d at 438. And the treatise, the majority says, uses both the phrases "where liability is clear" and

---

[2] The Florida Supreme Court has noted that our case law interpreting its "bad faith precedent does not always hit the mark." *Harvey v. GEICO Gen. Ins. Co.*, 259 So. 3d 1, 7 (Fla. 2018).

[3] The majority also reasons that certification is not warranted because neither party raised the issue of certification until after oral argument. Maj. Op. at 27 n.4. But "certification turns much more on federalism concerns than on timeliness concerns," and "a party need not raise the issue at all." *Whiteside v. GEICO Indem. Co.*, 977 F.3d 1014, 1018 (11th Cir. 2020); *see also* 17A Charles Alan Wright et al., *Federal Practice and Procedure* § 4248 (3d ed. 1998) (explaining that "[o]rdinarily a court will order certification on its own motion" because "[i]t is in the best position to determine whether it feels confident in its reading of the state law").

22-12675                LAGOA, J., Dissenting                5

"[w]here liability was reasonably obvious," in discussing an in-surer's duty to initiate settlement negotiations. Appleman, *supra*, § 4711 at 376, 383. Notably, when discussing an insurer's duties "[w]here liability was reasonably obvious," the treatise relies on the lower court decision in *Rova Farms*. *See id.* at 376 n.19. Then, the majority walks through dictionary definitions for the terms "obvious" and "clear." *See* Maj. Op. at 12–14. And finally, the majority cites four cases "involv[ing] fact patterns where liability could be described as obvious" in which Florida courts have described the liability as "clear." *Id.* at 14–15.

This analysis fails to convince me that Florida law is sufficiently settled with respect to the questions posed by this case. For one, "the language of an opinion is not always to be parsed as though we were dealing with [the] language of a statute." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 341 (1979). And the main question posed by this case is not the meaning of "clear" in the abstract, but instead whether, under Florida law, a reasonable jury could find Kinsale acted in bad faith by failing to initiate settlement negotiations on these facts. For that reason, judicial opinions "must be read with a careful eye to context." *Id.* at 374; *accord Illinois v. Lidster*, 540 U.S. 419, 424 (2004) (explaining that courts should "read general language in judicial opinions . . . as referring in context to circumstances similar to the circumstances then before the Court and not referring to quite different circumstances that the Court was not then considering"); *cf. Watts v. BellSouth Telecomms., Inc.*, 316 F.3d 1203, 1207 (11th Cir. 2003) ("Whatever their opinions say, judicial decisions cannot make law beyond the facts of the cases in

6                    LAGOA, J., Dissenting                    22-12675

which those decisions are announced."). Thus, although the majority points to two Florida Supreme Court decisions that have used a dictionary to interpret a phrase used in a judicial opinion, Maj. Op. at 13,[4] these two cases (really one) do not provide all that much insight into how the Florida Supreme Court would go about applying the common law, "that is, the law as courts have said it is in deciding cases," *Emerson v. Lambert*, 374 So. 3d 756, 760 (Fla. 2023), in different factual circumstances.[5]

The cases cited by the majority similarly provide little insight. To be sure, the cited cases provide examples of when "clear liability" exists. But all four cases arise from a similar fact pattern that is far different from the facts that face us here. In *Berges v. Infinity Insurance Co.*, 896 So. 2d 665 (Fla. 2004), the insurer's initial investigation revealed that the driver of the insured's car was intoxicated and "'100%' at fault" for causing a collision that killed one person and seriously injured another.[6] *Id.* at 669. In *Goheagan*, the

_____

[4] In *State v. Kinchen*, 490 So. 2d 21 (Fla. 1985), the Florida Supreme Court relied on a dictionary to define when a prosecutor's comment is "fairly" susceptible of being interpreted by a jury as referring to a defendant's failure to testify, which is a standard adopted by the Florida Supreme Court in one of its previous cases. *Id.* at 22. And the next year, in *State v. Grissom*, 492 So. 2d 1324 (Fla. 1986), the Florida Supreme Court quoted *Kinchen*'s quotation of that dictionary definition. *Id.* at 1325.

[5] I find the majority's reliance on sister circuit decisions unhelpful for the same reasons. *See* Maj. Op. at 13 n.2.

[6] The issue addressed in *Berges* is different than this case, for there the claimant submitted a settlement offer before suit was filed. 896 So. 2d at 669–71. However, the Florida Supreme Court in *Berges* did speak of "clear liability" in the

22-12675                LAGOA, J., Dissenting                        7

insurer's claim adjuster, within a few days of being assigned the claim, determined that the insured "was the sole cause" of a motor vehicle accident, which involved the insured rear-ending the decedent while "traveling at a high rate of speed with a blood alcohol [level] of .19." 107 So. 3d at 434–35. In *Powell*, a case concerning a motor vehicle accident in which the insured's daughter struck two pedestrians, the insurer evaluated the insured's liability as "80–100%" within days of the accident. 584 So. 2d at 13. And in *Robinson v. State Farm Fire & Casualty Co.*, 583 So. 2d 1063 (Fla. Dist. Ct. App. 1991), it was undisputed that the insured ran a stop sign and severely injured the claimant.[7] *Id.* at 1064.

---

context of bad faith insurance law, *see id.* at 681, and thus I still find it relevant to our consideration of the factual circumstances where Florida courts have recognized "clear liability."

[7] The majority's reliance on Appleman's *Insurance Law and Practice* does not provide much clarity either. *See* Maj. Op. at 15. The quoted portion provides that "the duty to make a good faith effort to negotiate a settlement is clear" where "liability is clear and the injuries serious so that a judgment in excess of policy limits is a likely possibility." Appleman, *supra*, § 4711, at 383. This language is nearly identical to the key language from *Powell* itself, which provides that "an insurer has an affirmative duty to initiate settlement negotiations" where "liability is clear, and injuries so serious that a judgment in excess of the policy limits is likely." 584 So. 2d at 14. I do not read the language the majority focuses on, which provides that a duty exists where a judgment in excess of the policy limits is "a likely possibility," to suggest that the duty under *Powell* kicks in when liability is unsettled. Instead, as is evident from *Powell*, that language is focused on the second inquiry, the likelihood of an excess judgment in light of the claimant's injuries.

8                          LAGOA, J., Dissenting                          22-12675

Other Florida cases that concern "clear liability" also share similar facts.  For example, in *Harvey v. GEICO General Insurance Co.*, 259 So. 3d 1 (Fla. 2018), the insurer "resolved the liability issue adversely" to its insured two days after a car accident that left the victim dead.  259 So. 3d at 4.  And in *Farinas v. Florida Farm Bureau General Insurance Co.*, 850 So. 2d 555 (Fla. Dist. Ct. App. 2003), the insured lost control of his car and it crossed over a median, resulting in a car accident, injury, and death.[8]  *Id.* at 557.  The insured's liability in that case "was not in question."[9]  *Id.*

Notably absent from these cases is any discussion of a viable defense to the insured's liability.  Additionally, while our inquiry is an objective one, in almost all these cases, the insurer quickly recognized that its insured was liable.  It makes sense that inaction in these types of circumstances provided a basis to find that an insurer acted in bad faith.  After all, *Powell* provides that bad faith may be inferred from "a delay in settlement negotiations which is willful and without reasonable cause."  584 So. 2d at 14.

---

[8] Like *Berges*, while the court in *Farinas* was not applying *Powell*, it did describe the case as one involving "clear liability," *see* 850 So. 2d at 562, and thus I include it here.

[9] In another case, *Gutierrez v. Yochim*, 23 So. 3d 1221 (Fla. Dist. Ct. App. 2009), where the claimant never made "a formal offer to settle the case," a Florida district court of appeal said that an insurer's "failure to tender the policy limits created a genuine issue of material fact regarding whether it breached its duty of good faith."  *Id.* at 1226.  There too, the insurer knew "within days of the accident that its insured was entirely at fault in causing the accident" and that the claimant "suffered catastrophic injuries."  *Id.* at 1225.

22-12675                LAGOA, J., Dissenting                9

Here, things are different.  To start, viable defenses existed at the time the representative of the Estate of Tanya Oliver (the "Estate") filed suit, which complicated the liability picture.  Daniel Santaniello, a lawyer with experience concerning both negligent security and bad faith insurance law, outlined different theories below in an expert report on behalf of Kinsale.  For example, under Florida law, "[v]isitors upon the private property of others fall within one of three classifications: they are either trespassers, licensees, or invitees." *Post v. Lunney*, 261 So. 2d 146, 147 (Fla. 1972).  As relevant here, "[a]n invitee "is a visitor on the premises by invitation, either express or reasonably implied, of the owner." *Arp v. Waterway E. Ass'n, Inc.*, 217 So. 3d 117, 120 (Fla. Dist. Ct. App. 2017).  And "a trespasser is a person 'who enters the premises of another without license, invitation, or other right, and intrudes for some definite purpose of his own, or at his convenience, or merely as an idler with no apparent purpose, other than perhaps to satisfy his curiosity.'"  *Id.* at 121 (quoting *Post*, 261 So. 2d at 147)).

This classification is important, because in premises liability cases, "the defendant's duty to the plaintiff is dependent on the plaintiff's status to the land."[10]  *Nicholson v. Stonybrook Apartments, LLC*, 154 So. 3d 490, 492 (Fla. Dist. Ct. App. 2015).  And, under Florida law, property owners owe a lower duty of care to a trespasser than they do an invitee.  *See* Fla. Stat. § 768.075(2), (3)(b) (2015).  With respect to invitees, businesses "owe a duty of reasonable care

---

[10] Negligent security cases "fall under the auspices of premises liability as opposed to ordinary negligence." *Nicholson*, 154 So. 3d at 494.

. . . to maintain safe conditions on business premises," which includes "taking action to mitigate or eliminate the possibility of a foreseeable risk of harm before it occurs." *Valladares v. Bank of Am. Corp.*, 197 So. 3d 1, 13 (Fla. 2016). The only duty owed to an "undiscovered trespasser," on the other hand, is to "refrain from causing intentional harm," and, with respect to a "known trespasser," the only duty owed "is to refrain from gross negligence / intentional harm and to warn of known conditions that are not readily observable by others." *Nicholson*, 154 So. 3d at 492; *see* Fla. Stat. § 768.075(3)(b) (2015).

Additionally, the "status of a visitor to land possessed by another may change from one of the three categories to another" and is determined "as of the time that the visitor is injured." *Byers v. Radiant Grp., L.L.C.*, 966 So. 2d 506, 509 (Fla. Dist. Ct. App. 2007); *accord Brant v. Matlin*, 172 So. 2d 902, 904 (Fla. Dist. Ct. App. 1965) ("There does not appear to be any doubt that the status of a person upon the land can change. Courts, in considering this problem, indicate that the criteria of status is to be determined as of the time of the injury."). For example, "an invitee ceases to be an invitee," and becomes a licensee or trespasser, "after the expiration of a reasonable time within which to accomplish the purpose for which he is invited to enter, or to remain," on the land. *Byers*, 966 So. 2d at 509 (quoting Restatement (Second) of Torts § 332 cmt. l (Am. L. Inst. 1965)); *see also Steinberg v. Irwin Operating Co.*, 90 So. 2d 460, 461 (Fla. 1956) ("When the visitor crosses the boundaries of the invitation, he ceases to be an invitee. His status then changes to that of a licensee or even a trespasser."). "Whether at the expiration of

that time he becomes a trespasser or a licensee will depend upon whether the possessor does or does not consent to his remaining on the land." Restatement (Second) of Torts, *supra*, § 332 cmt. l.

Among other things, the Lodge, during the underlying negligent security case, argued that because Oliver was ejected from the bar, she was no longer an invitee and was instead a trespasser. And at the conclusion of the underlying trial, the jury was tasked with determining whether Oliver was a trespasser at the time she suffered the fatal wounds. If the jury answered the question in the affirmative, then it was instructed to return its verdict in favor of the Lodge

It is true that one Florida court has said that a patron may not lose her status as an invitee by engaging "in a violent act or acts against other customers on the store's premises." *Byers*, 966 So. 2d at 509. But this case is different than *Byers* in that the Lodge affirmatively expelled Oliver and her group because of their physical altercation.[11] And although the jury ultimately determined that

---

[11] Another case the majority cites, *Borda v. East Coast Entertainment, Inc.*, 950 So. 2d 488 (Fla. Dist. Ct. App. 2007), treated an expelled party as an invitee. There, after the trial court entered a directed verdict in favor of the property owner, the main issue on appeal was whether an expelled patron could recover for injuries suffered in the parking lot. *See id.* at 490–92. And Florida's Fourth District Court of Appeal concluded that the patron could, stating that the "evidence presented proved that the Lounge's duty of care to its invitees extended to the nearby parking lot which was one used by the up to 2000 invitees patronizing the Lounge." *Id.* at 491. But it does not appear from the opinion in *Borda* that the Fourth District Court of Appeal considered the question of whether an expelled patron could be considered a trespasser.

Oliver was not a trespasser, it does not follow that, long before the jury made this determination, the Lodge's liability was clear. The existence of these questions as to Oliver's status muddies the waters and distinguishes this case from those cited by the majority. Similarly, while it may be true, as the majority posits, that the Lodge "could still potentially be liable for gross negligence if the Lodge knew Oliver was in the parking lot into which it had turned her out," Maj. Op. at 24, this possibility also does not mean that liability was clear before the Estate filed its suit.

Consider also foreseeability and causation. A business owner typically owes invitees "a duty to protect against those risks which are reasonably foreseeable."[12] *Hall v. Billy Jack's, Inc.*, 458 So. 2d 760, 761 (Fla. 1984). Foreseeability is determined in light of all the circumstances of the case. *See Holiday Inns, Inc. v. Shelburne*, 576 So. 2d 322, 331 (Fla. Dist. Ct. App. 1991), *disapproved of in part on other grounds by Angrand v. Key*, 657 So. 2d 1146 (Fla. 1995). Among other things, foreseeability "may be established by proving that a proprietor had actual or constructive knowledge of a particular assailant's inclination toward violence or by proving that the proprietor had actual or constructive knowledge of a dangerous condition on his premises that was likely to cause harm to a patron."

---

Therefore, this potential defense remained viable before suit was filed. *See Fla. Highway Patrol v. Jackson*, 288 So. 3d 1179, 1183 (Fla. 2020) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." (quoting *Webster v. Fall*, 266 U.S. 507, 511 (1925))).

[12] This assumes that Oliver remained an invitee after being expelled.

22-12675                LAGOA, J., Dissenting                13

*Hall*, 458 So. 2d at 761.  Other factors include "the general likelihood of harm to the invitee, criminal activity in the vicinity, and security measures taken by the owner of the premises." *Meyers v. Ramada Hotel Operating Co.*, 833 F.2d 1521, 1523 (11th Cir. 1987) (applying Florida law).

As for causation, the plaintiff must prove "that it is more likely than not that the conduct of the defendant was a substantial factor in bringing about the result." *Gooding v. Univ. Hosp. Bldg., Inc.*, 445 So. 2d 1015, 1018 (Fla. 1984) (quoting Prosser, *Law of Torts* § 41 (4th ed. 1971)); *see also McCain v. Fla. Power Corp.*, 593 So. 2d 500, 503 (Fla. 1992) ("In the past, we have said that harm is 'proximate' in a legal sense if prudent human foresight would lead one to expect that similar harm is likely to be substantially caused by the specific act or omission in question.").  In other words, a jury must find that a "foreseeable risk of harm to patrons existed," that the "risk was either created or tolerated" by the premises owner, that the premises owner "could have remedied the danger but failed to do so," and "that because of that failure," the injury occurred.  *Stevens v. Jefferson*, 436 So. 2d 33, 34 (Fla. 1983).  Importantly, an intervening act, depending on whether it is foreseeable, may disrupt the causal chain.  *See Gibson v. Avis Rent-A-Car Sys., Inc.*, 386 So. 2d 520, 522 (Fla. 1980).

Here, one of the feuding groups—which included the individuals who shot Oliver—retrieved their vehicle after the second fight was broken up, and then drove back with their weapons, opening fire on the vehicle Oliver was in.  Additionally, the feud

between the parties began before they entered the Lodge in March 2015, as a member of each group had a romantic past with the same man. According to one of the reports prepared by David Danowit, it appeared that the shooting "was bound to happen somewhere, as the shooter was looking for payback with [an] unknown female regarding an unknown male."[13]

During the underlying negligent security trial, the Lodge and the Estate presented dueling expert testimony as to whether the shooting of Oliver was foreseeable in light of these facts. While, as the majority notes, there was at least one prior incident that included a fight on the Lodge's property, which is normally relevant with respect to foreseeability, *see Czerwinski v. Sunrise Point Condo.*, 540 So. 2d 199, 201 (Fla. Dist. Ct. App. 1989), the Lodge's expert opined that it was irrelevant here due to the presence of the interpersonal conflict. The Lodge's negligent security expert also

---

[13] The majority references Lodge leadership's preexisting concerns about the performance of the security guards and the lighting in the Lodge's rear parking lot. Maj. Op. at 4, 19. The majority also cites statements from one of the security guards on duty the night of the incident, who said that one of the shooters bragged to him in the past that she was "liable to shoot," and who also indicated that he knew that it was not the best practice to expel two conflicting groups at the same time. *Id*. at 7, 19. But all this was revealed through a deposition taken after suit was filed—and thus is irrelevant to our inquiry—which, as the majority recognizes, is focused on what Kinsale knew, or should have known, before suit was filed. *See id*. at 11. The majority does not explain how Kinsale should have known this information in light of this security guard's reluctance to participate in Danowit's pre-suit investigation, as well as the failure of Lodge leadership to provide Danowit with much assistance or relevant information.

opined that, given the personal nature of the shooting, it would not have been preventable, even if the Lodge had a security guard remain in the parking lot. This is especially the case here, the expert said, because the shooting occurred while both Oliver and the shooters were in their respective cars, suggesting that the presence of a security guard would not have had much of an effect. Finally, the fact that shooters left the premises and then returned also suggests that the way the security guards turned out both groups may not have contributed to Oliver's shooting. Even if the Lodge followed the supposed industry standard included in the record—turn out the more aggressive party, watch them leave the premises, and then turn out the other party, ideally through a separate door—it is possible the shooters still would have retrieved their firearms and returned.

As with the previously mentioned defenses, it is true that the jury ultimately determined that the shooting of Oliver was foreseeable and that the Lodge's security measures were inadequate and a cause of Oliver's injuries. The point, however, is not that these defenses are airtight, but that they mean the liability picture was not entirely "clear" or "obvious" before the Estate filed suit. And Florida courts, to this point, have not suggested that an insurer, facing a liability picture of the kind we consider here, is under an obligation to initiate settlement negotiations.

In sum, from the Florida case law we have, we know one fact pattern where a reasonable jury could find *Powell* to apply. *See, e.g.*, *Harvey*, 259 So. 3d at 4; *Goheagan*, 107 So. 3d at 434–35. But we

do not know whether a Florida court would conclude that a reasonable jury could find *Powell* applies on the facts at issue here. In other words, the relevant Florida case law "fails to fit neatly into the complex factual pattern at hand." *Stevens v. Battelle Mem'l Inst.*, 488 F.3d 896, 903 (11th Cir. 2007).

Thus, instead of extending *Powell* to new, materially different circumstances, we should ask the Florida Supreme Court, the only court that can provide the correct answer to this question, for guidance as to *Powell*'s reach. While I understand that recent legislative changes in Florida may have the effect of reducing bad faith claims, *see* Ch. 2023-15, § 4, Laws of Fla., these amendments do not answer the question we are tasked with considering here, nor do they prevent plaintiffs from making use of *Powell* in attempting to establish bad faith liability. Further, this case has "policy implications" for Florida. *Altman Contractors, Inc.*, 832 F.3d at 1326. Allowing a bad faith case to proceed on these facts—and expanding the reach of *Powell* in the process—will inevitably affect Florida's liability insurance consumers, as more bad faith judgments bring higher premium costs. *See Berges*, 896 So. 2d at 686 (Wells, J., dissenting) ("It is an undeniable fact which follows logic and common sense that bad faith judgments against insurers drive up the premium costs for all insureds, particularly for insureds who purchase low-limits liability insurance policies.").

While the Florida Supreme Court may conclude that a reasonable jury could find clear liability on these facts, it is for that court, not this one, to make a decision that has such ramifications.

I would therefore certify a question to the Florida Supreme Court, asking whether a reasonable jury, under Florida law, can conclude that *Powell* applies on these facts.[14]

### B.

Even if the majority is correct that certification is unnecessary, its decision to reverse the district court's entry of summary judgment and remand this case for trial is inconsistent with its own understanding of Florida law. Faced with a factual dispute as to the Lodge's liability before suit was filed, I cannot see how we can

---

[14] Because the resolution of whether there is a genuine issue of material fact depends on whether a reasonable jury could find that Kinsale acted in bad faith by failing to initiate settlement negotiations under *Powell*, and there is no controlling precedent from the Florida Supreme Court on the question, this question meets the standard for certification under Florida law. *See* Fla. Stat. § 25.031; Fla. R. App. P. 9.150(a). The Lodge's argument that this case can be disposed of based on federal law governing summary judgment begs the question, for without knowing the proper state law standard to apply with respect to *Powell*, we are unable to correctly apply the federal summary judgment standard. Moreover, while the Lodge argues on appeal that Kinsale also failed to adequately investigate the incident, this duty is closely connected with the duty to initiate settlement negotiations, as the Lodge recognizes. Therefore, even if it is true that Kinsale failed to adequately investigate the incident, the Lodge would run into a causation problem if an adequate investigation were to reveal that liability was not clear. And while the Estate, in response to Kinsale's motion for certification, appears to suggest that we need not address whether the Lodge's liability was clear to decide this case, it has long based its bad faith claim mostly on the argument that Kinsale breached its duty to initiate settlement negotiations, and the only way to determine whether that is the case under Florida law is to determine whether the Lodge's liability was clear before suit was filed.

conclude that it was "perfectly clear or manifest" or "obvious and impossible to be mistaken about." Maj. Op. at 14.

To start, there is disagreement between those with knowledge of the case's facts before suit was filed. Most importantly, the Lodge's corporate representative continued to dispute the Lodge's liability in his deposition testimony. Indeed, the Lodge steadfastly maintained that it was not at fault for what happened to Oliver, only to also argue, for the purposes of this case, that its liability has been clear from the beginning.

This lack of clarity is compounded by the disagreement among the rest of those involved. Catherine Thrift, who investigated the incident for Kinsale, never found there to be clear liability. The investigative reports prepared by Danowit also do not assign clear liability to the Lodge. Mitchell Adelman, the owner of the company for which Danowit worked, did not find there to be clear liability either. And Peter Alfeche, who testified that he would have tendered the $50,000 policy limit before suit was filed, elsewhere equivocated as to the clarity of the Lodge's liability. He said both that the Lodge's liability was questionable and that Danowit's reports did not include any evidence of clear liability.

On the other side of the ledger, the three attorneys that represented Oliver and her Estate testified that liability was clear from the beginning. And, as the majority notes, Appellants' two experts have taken the position that the Lodge's liability should have been clear to Kinsale before suit was filed. But Kinsale has also produced two experts—Santaniello and Douglas M. McIntosh, a lawyer with

decades of experience in insurance law—both of whom concluded that the Lodge's liability was not clear when the Estate filed suit. Such disagreement as to liability is not found in past Florida cases in this area, and I think it is hard to say that the Lodge's liability was "obvious and impossible to be mistaken about," Maj. Op. at 14, given this back-and-forth.

Further confirming the fact that this case is not one of clear liability under the majority's standard is, as explained above, the existence of viable affirmative defenses when suit was filed. *Powell* provides that a jury may infer bad faith "from a delay in settlement negotiations which is willful and without reasonable cause," 584 So. 2d at 14, and here, the affirmative defenses supply the reasonable cause that has been missing in cases where *Powell* has before been applied.

This case is also not controlled by the two published cases where this Court has applied *Powell* to conclude that a reasonable jury could find that an insurer acted in bad faith. The closest case is *American Builders Insurance Co. v. Southern-Owners Insurance Co.*, 71 F.4th 847 (11th Cir. 2023). There, the claimant, an individual performing work for the insured, fell from a roof and was paralyzed from the waist down. *Id.* at 851. The claimant's attorney demanded that American Builders, one of the insurers and the plaintiff in the bad faith action, pay its $1 million dollar policy limit. *Id.* But later, the claimant's attorney discovered that Southern-Owners, the defendant in the bad faith action, was the primary insurer. *Id.* The claimant's attorney proceeded to provide Southern-

Owners with different documents, including the claimant's medical bills and correspondences sent to American Builders explaining how the accident happened. *Id.* In response, Southern-Owners tried to set up a meeting with the insured's principal and communicated with American Builders about defending the insured under a reservation of rights, noting that its policy may not apply due to an employer liability exclusion. *Id.* at 852. Almost three months after receiving notice, Southern-Owners met with the principal, and left the meeting with the belief that it "had a strong liability defense." *Id.* Eventually, American Builders and another insurer tendered their policy limits, Southern-Owners did not, and a bad faith case ensued. *Id.* at 853.

American Builders prevailed following a three-day jury trial, and this Court affirmed, concluding that "there was enough evidence to allow the jury to reasonably find that Southern-Owners acted in bad faith because it delayed acting on its duty to investigate and settle [the claimant's] claim." *Id.* at 855. This was because Southern-Owners, after receiving evidence of the claimant's paraplegic status and theory of liability, delayed meeting with the company's principal, and then, after meeting with the principal, delayed meeting with other workers that were on site the day of the accident. *Id.* at 855–56.

*American Builders* is like this case in the sense that potential defenses to liability existed. But it is different in that there, claimant's counsel provided information to Southern-Owners as to both the claimant's injuries and the claimant's theory of liability. The

jury could infer bad faith from the insurer's inaction that followed. Here, on the other hand, claimant's counsel provided no such insight. While the focus in a bad faith case is on the conduct of the insurer, not the claimant, we have recognized that it is permissible to consider the claimant's actions. *See Pelaez v. Gov't Emps. Ins. Co.*, 13 F.4th 1243, 1254 (11th Cir. 2021) ("In a bad faith action there's a difference between *focusing* on a claimant's actions, which would be improper, and *factoring* a claimant's actions into the totality of the circumstances analysis, which is not improper.").[15] Further, while this Court concluded that the "jury could reasonably find that Southern-Owners completely neglected its 'affirmative duty to initiate settlement negotiations' while [the claimant's] hospital bills climbed due to his traumatic injury," it never explained why the case was one of clear liability. *Am. Builders*, 71 F.4th at 856 (quoting *Powell*, 584 So. 2d at 14). Nor was there discussion of the liability defenses that Southern-Owners believed its insured had. Here, on the other hand, with the issue squarely before us and after reviewing the defenses to liability, I do not believe the Lodge's liability was clear before the Estate filed suit and thus do not conclude that

---

[15] Under a recent change to Florida's bad faith law—which does not apply in this case—insureds, claimants, and their representatives "have a duty to act in good faith in furnishing information regarding the claim, in making demands of the insurer, in setting deadlines, and in attempting to settle the claim." Ch. 2023-15, § 4, Laws of Fla. (codified at Fla. Stat. § 624.155(5)(b)1.). In a bad faith case, "the trier of fact may reasonably reduce the amount of damages awarded against the insurer" if this duty to act in good faith is breached. *Id.* (codified at Fla. Stat. § 624.155(5)(b)2.).

22                    LAGOA, J., Dissenting                    22-12675

a reasonable jury could find that Kinsale possessed a pre-suit duty to initiate settlement negotiations.

Ilias v. USAA General Indemnity Co., 61 F.4th 1338 (11th Cir. 2023), the other published case where we held that a reasonable jury could find that an insurer acted in bad faith under *Powell*, is similar to the Florida cases I discussed previously. There, after an initial collision with another car, the insured's vehicle launched into oncoming traffic and landed on top of the claimant's car, causing catastrophic injuries to the claimant. *Id.* at 1341. Around two weeks after the accident, the insurer's liability adjuster received a police report concluding that the insured "was solely at fault," and the adjuster determined that the insurer would be accepting liability. *Id.* at 1342. The report also detailed the severity of the claimant's injuries. *Id.* But the insurer did not tender the policy limit for over a month. *Id.* at 1342–43. And, because of this, we determined that a reasonable jury could find that the insurer acted in bad faith for, among other things, delaying initiating settlement negotiations with the claimant. *Id.* at 1345–47. Here, on the other hand, the Lodge's liability was not so clear, and the insurer never concluded that it would accept liability. Therefore, *Ilias* is unlike this case and does not support the majority's conclusion.

In all, even under the majority's definition of "clear liability," the district court properly entered summary judgment in Kinsale's favor.[16]

---

[16] This is not to suggest that I agree with all the district court's reasoning as to why liability was not clear. For example, the fact that "a jury ultimately found

22-12675                    LAGOA, J., Dissenting                    23

### III.

The Florida Supreme Court has recognized that our case law interpreting its "bad faith precedent does not always hit the mark." *Harvey*, 259 So. 3d at 7. It is the Florida Supreme Court, not this Court, that should be deciding whether *Powell* applies in new circumstances. And even if the majority was correct to decide this issue rather than certify a question to the Florida Supreme Court, the facts of this case demonstrate that liability was not clear before the Estate filed its negligent security suit. This means that Kinsale was not under an obligation to initiate settlement negotiations, and that its delay in doing so was not "willful and without reasonable cause." *Powell*, 584 So. 2d at 14. A reasonable jury thus could not infer bad faith on these facts. For these reasons, I respectfully dissent.

---

the Lodge only 70% liable" is not all that relevant in determining whether, before suit was filed, the Lodge was clearly liable.